Anne L. Leary (Bar No. 010044)
William F. King (Bar No. 023941)
Tyler S. Woods (Bar No. 037128)
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
anne.leary@gknet.com
bill.king@gknet.com
tyler.woods@gknet.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Schmidt, an individual, | No. |
| Plaintiff, | **Complaint** |
| v. | |
| Employee Deferred Compensation Agreement dated July 3, 2003; Temprite Company, an Illinois corporation; Robert Brown, Plan Administrator, | |
| Defendants. | |

For her Complaint against Defendants, Plaintiff Patricia Schmidt ("Patricia")

alleges and states as follows:

## Nature of Lawsuit

1.      This lawsuit arises out Defendants' refusal to pay monthly survivor benefits

to Patricia as the surviving spouse of George Schmidt ("George") under the provisions of

that certain binding Employee Deferred Compensation Agreement (the "Agreement"),

dated July 3, 2002, between George and Defendant Temprite Company ("Temprite" or the

"Company").

2.      Patricia was legally married to George for twenty-five years before he passed away on August 9, 2020 in Arizona.

3.      For many years, George served as the Company's President and Chief Executive Officer.

4.      At the time of his death, George was the Company's largest shareholder and board member.

5.      The Agreement is subject to and governed by the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

6.      Pursuant to the Agreement, ¶ 3, upon George's death, Patricia was entitled to a survivor annuity payable monthly during her lifetime in an amount equal to four thousand five hundred and eighty-three dollars and thirty-three cents ($4,583.33).

7.      Despite Patricia's repeated demands for payment, Defendants have refused without explanation to make the survivor annuity payments to which she is entitled.

8.      Patricia accordingly seeks specific performance of the Agreement, payment of all of the survivor annuity benefits to which she is entitled under the Agreement, pre- and post-judgment interest as permitted, attorneys' fees and costs, and any other appropriate relief in law or equity.

**Jurisdiction and Venue**

9.      Jurisdiction is proper under ERISA, and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f).  The Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Patricia's claims arise under ERISA.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Patricia's claims occurred in Arizona and under 15 U.S.C. § 78aa because, upon information and belief, the Company transacts business within this State.

**Parties**

11.      Patricia is a resident and citizen of Arizona who is 87-years of age.

12.      Patricia is a "beneficiary" as that term is defined under 29 U.S.C. § 1002(8).

2

13.     Defendant Temprite Company ("Temprite" or the "Company") is an Illinois S-corporation that purports to specialize in energy-efficient coalescent and conventional oil separators, oil reservoirs, drier housings, liquid receivers, suction accumulators and refrigerant oil management products for all refrigerants, including traditional and natural refrigerants: ammonia ($NH_3$), carbon dioxide ($CO_2$), and hydrocarbons (HCs).  Upon information and belief, Temprite has at all times relevant hereto conducted business in Arizona and has sued and has been sued in Arizona.  Temprite's Chairman, Thomas Schmidt, also conducts Temprite business from his home in Scottsdale, Arizona. Temprite serves as the Plan Sponsor of the Agreement for purposes of ERISA.

14.     Defendant Robert Brown who, upon information and belief, is a resident of Illinois, served as the Company's Controller, Secretary, and Treasurer and as the Named Fiduciary and Plan Administrator.  As the Named Fiduciary and Plan Administrator under the Agreement, Defendant Brown was and remains duty-bound "for the management, control and administration of th[e] Agreement," which per its terms is governed by Arizona law.

15.     Plaintiff brings her claims herein against Temprite in its capacity as the Plan's Sponsor under the Agreement, and against Defendant Brown in his capacity as the Plan's Named Fiduciary and Plan Administrator.  In addition, Temprite is named as Defendant hereto because the Agreement is an unfunded plan, and under the Agreement's terms, Temprite is responsible for paying the benefits due and owing to Patricia out of its own assets.

**General Allegations**

16.     On July 3, 2003, George, on one hand, and Temprite, on the other hand, entered into the Agreement, a true and correct copy of which is appended hereto as **Exhibit A**.

17.     The Agreement provides that it is intended to be—and shall be construed and administered as—an Employee Pension Benefit Plan under the provisions of the Employee Retirement Income Security Act of 1974, as amended.  Ex. A, ¶ 1.

18.     More specifically, "the Agreement is intended as a 'top hat' plan under ERISA," which is unfunded, maintained by the Company for the purpose of providing deferred compensation to George, who the Company described as a "key employee and officer [who] made a significant contribution to the Corporation's growth and success through long term service to the Corporation . . . during years in which the Corporation was unable to adequately compensate him." *Id.*, Recital A.

19.     The Agreement's "Deferred Compensation" provisions provide that, upon George's death, Temprite shall pay his spouse a survivor annuity equal to four thousand five hundred and eighty-three dollars and thirty-three cents ($4,583.33) per month. *Id.*, ¶ 3(a) ("Upon Employee's termination of employment with the Corporation due to . . . (ii) death, Corporation shall pay to Employee, and upon his death, to his spouse, a Joint and Survivor Annuity equal to Four Thousand Five Hundred Eighty-Three and 33/100 Dollars ($4,583.33) per month.  Said Joint and Survivor Annuity shall commence on the first day of the first calender [sic] month following said termination of employment, and shall continue on the first day of each month thereafter for Employee's lifetime, and upon Employee's death, in the same amount to Employee's spouse for her lifetime.").

20.     Pursuant to United States Department of Labor Regulations, 29 CFR § 2520.104-23, Defendant Brown filed a statement with the Labor Secretary registering the Agreement dated July 25, 2003, a true and correct copy of which is appended hereto as **Exhibit B.**

21.     That letter statement reads in material part: "Please be advised that Temprite Co., an S Corporation, has an agreement with a shareholder, and such agreement is determined to be a "plan" under ERISA, and would be an employee benefit plan primarily established and maintained for the purpose of providing a plan of deferred compensation and salary continuation to a select group of highly compensated employees.  Only one employee participates in this plan."  Ex. B.

22.     The July 25, 2003 statement was sent to the United States Department of Labor by "Certified Mail—Return Receipt Requested" with a carbon copy to George.  *Id.*

4

23.    George, prior to his passing, had served as the Company's President and Chief Executive Officer.  George had explained to Patricia during his lifetime that she would receive monthly payments from Temprite upon his death.  George did not show Patricia a copy of the Agreement, nor did he provide any specific details about the Agreement.

24.    George died on August 9, 2020, while he was still married to Patricia.

25.    Following George's death, Defendants did not notify Patricia that she was entitled to survivor benefits under the Agreement.

26.    Shortly after George's passing, Patricia contacted Temprite to inquire about the status of benefits George had previously described to her.

27.    Despite her documented inquires to Temprite, multiple Temprite executives orally denied that Patricia was entitled to any benefits.

28.    By way of one example, Patricia contacted Temprite's President, Mr. James Nonnie.  During Patricia's discussion with Mr. Nonnie, she relayed to Mr. Nonnie George's statements regarding Patricia's entitlement to continued monthly payments and generally inquired as to when those payments would commence.  Mr. Nonnie denied that Patricia was entitled to receive any deferred compensation payments and claimed Temprite did not have any such agreement with George.

29.    By way of another example, Patricia weeks later later called and spoke with Defendant Brown who, like Mr. Nonnie, denied that Temprite had any such agreement with George, despite his knowledge to the contrary, as confirmed by Exhibit B.

30.    It was not until August 20, 2021 that Patricia, through the assistance of her lawyer-granddaughter, was able to locate a copy of the Agreement, which was found inside a storage box of documents George had maintained during his lifetime.

31.    The Agreement is signed by George and counter-signed by the Company's President at the time, Tom Schmidt, on behalf of Temprite and identified Defendant Brown as the "Named Fiduciary and Plan Administer."

32.    In accordance with the Agreement's claims procedure, ¶ 19, on September 9, 2021, Patricia sent a formal written demand for benefits to Defendants via email and

Federal Express.  A true and correct copy of the September 2021 Demand is appended hereto as **Exhibit C**.

33.     In a letter dated September 30, 2021 to counsel representing Patricia in the Arizona probate of George's estate, Defendant Temprite's counsel acknowledged receipt of the September 2021 Demand.  A true and correct copy of that letter is appended hereto as **Exhibit D**.  Temprite's counsel's September 30, 2021 letter did not address the issues raised in the September 2021 Demand.  The September 30, 2021 letter from Defendant Temprite's counsel was insufficient to satisfy the provisions of ERISA, § 503, 29 U.S.C. § 1133(1) and the Agreement, ¶ 19.  *See also* 29 CFR § 2560.503-1(a) ("Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations[.]"); 29 CFR § 2560. 503-1(f)(1) (stating in part "if a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time"); 29 CFR § 2560-503-1(g)(1)(i)-(iv) (providing "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination" including "the specific reason or reasons for the adverse determination", "a reference to the specific plan provisions on which the determination is based", (iii) "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary", and (iv) "a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of [ERISA] following an adverse benefit determination on review.").

34.     Per the terms of the Agreement's claim procedure, ¶ 19, if a claimant's initial claim is denied, he or she may request, in writing, a review of that denial by the Named Fiduciary and Plan Administrator.

35.     Patricia treated the Plan Administrator's failure to respond in writing to her initial claim in accordance with ERISA, § 503, 29 U.S.C. § 1133(1) and the regulations issued thereunder as a denial of that claim, and on February 1, 2022, she sent a letter to Temprite via certified mail requesting a review of the denied claim.  A true and correct copy of that letter is appended hereto as **Exhibit E**.

36.     The Company did not respond to the February 2022 Demand, contrary to the requirements of ERISA § 503, 29 U.S.C. § 1133(2), and the Agreement, ¶ 19.  *See also* 29 CFR § 2560-1(h)(1) (stating in part "Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination" and "the plan administrator shall notify a claimant in accordance with paragraph (j) of this section of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan"); 29 CFR § 2560-1(j)(1)(i) and (ii) (providing "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination" including "the specific reason or reasons for the adverse determination" and "reference to the specific plan provisions on which the benefit determination is based").

37.     Per the terms of the Agreement's claim procedure, ¶ 19, if a claim is denied following review, the claimant "may" request that the claim be submitted to arbitration.

38.     Treating the failure of Defendants to respond to the February 2022 Demand as denial of the claim on review, Patricia sent a third and final letter on May 23, 2022, a true and correct copy of which is appended hereto as **Exhibit F**.

39.     In her May 23 letter, Patricia reiterated her claim for benefits under the Agreement, and advised Defendants that, in light of their deliberate refusal to respond in writing to her September 2021 and the February 2022 demands, she would not be invoking arbitration on the grounds that doing so would be futile.  Accordingly, the May

2022 demand advised Defendants that Patricia would be filing a lawsuit seeking the benefits she is entitled to under the Agreement. *Id.*

40.     Patricia received no response to the May 2022 Demand, which along with the prior demands, have been deemed denied under the Agreement, ¶ 19, albeit with no explanation.

41.     Defendants are accordingly estopped from denying Patricia's claims for relief under the Agreement. *See e.g. Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court[.]"); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) ("That is, an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court.").

42.     Under the Agreement, ¶ 3, Defendants were required to make the first survivor annuity payment to Patricia on or before the first day of the calendar month following George's death, or by September 1, 2020.

43.     Defendants have failed to make the survivor annuity payments causing Patricia irreparable injury, all as alleged herein. *Id.*, ¶ 5 ("The parties hereto understand and agree that irreparable injury would be caused to Employee and his spouse and to the Corporation by failure of a party to comply with the terms of this Agreement; that in the event of any actual or threatened default in or breach of any of the provisions in this Agreement, the party or parties who are aggrieved thereby shall have the right to specific performance and/or an injunction, as well as monetary damages and any other appropriate relief in law or in equity which may be granted by any court in the United States of America; and that all such rights and remedies shall be cumulative.").

44.     Defendants' failure to provide an answer or justification explaining the basis upon which they refuse to make the survivor annuity payments to Patricia, or to otherwise

respond in writing to Patricia's three separate letters, is legally improper and contrary to the provisions of ERISA § 503, 29 U.S.C. § 1133, and 29 CFR §§ 2560.503-1(a), (f)(1), (g)(1), & (j)(1), not to mention the Agreement, ¶ 19.

45.     Patricia has been harmed as a result of Defendants' conduct.

## Count 1

### (ERISA Violation)

### (Against Defendants)

46.     Patricia incorporates Paragraphs 1 through 45 above as though fully set forth hereunder.

47.     ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), permits a plan beneficiary, like Patricia, to bring a civil action to recover benefits due under the terms of a plan, to enforce rights under the terms of a plan, and to clarify rights to future benefits under the terms of a plan.

48.     Patricia is a "beneficiary" as that term is defined under 29 U.S.C. § 1002(8); she is also a beneficiary under the Agreement, ¶ 9.  In those capacities, Patricia has standing to enforce the Agreement's terms and is entitled to those past and future survivor annuity payments that Defendants have wrongfully and willfully refused and withheld.

49.     Patricia has exhausted her administrative remedies under the Agreement and has otherwise fully performed thereunder.

50.     The Agreement remains in full force and effect and has not by its terms terminated.

51.     Patricia requests an order from the Court enforcing the terms of the Agreement and, to the extent necessary, for an order clarifying Patricia's rights to claim future benefits of the Agreement.

52.     Patricia is entitled to an award of costs and attorneys' fees under 29 U.S.C. § 1132(g)(1).

/ / /

**Prayer for Relief**

In light of the foregoing, Patricia prays for judgment against Temprite as follows:

A.  For equitable and injunctive relief as permitted, including an order compelling Defendants to specifically perform in accordance with the Agreement's terms;

B.  For pre- and post-judgment interest at the highest rate allowed by law;

C.  For Patricia's costs, disbursements, and attorneys' fees under 29 U.S.C. § 1132(g)(1) and any other applicable agreement, law, statute, or rule;

D.  For such further relief as the Court may deem just and proper.

Dated this 29th day of August, 2022.

                                            GALLAGHER & KENNEDY, P.A.


                                    By: */s/ Anne L. Leart*
                                            Anne L. Leary
                                            William F. King
                                            Tyler S. Woods
                                            2575 East Camelback Road
                                            Phoenix, Arizona 85016-9225
                                            *Attorneys for Plaintiffs*

9265034v3/40716-0001

# EXHIBIT A

**EXHIBIT A**

### EMPLOYEE DEFERRED COMPENSATION AGREEMENT

**THIS EMPLOYEE DEFERRED COMPENSATION AGREEMENT** is made this _3rd_ day of _July_, 2003, by and between TEMPRITE CO., a _"S"_ corporation ("Corporation"), and GEORGE SCHMIDT ("Employee").

### R E C I T A L S :

A. Employee is a key employee and officer, and has made a significant contribution to the Corporation's growth and success through long term service to the Corporation; and Employee has provided those services to the Corporation during years in which the Corporation was unable to adequately compensate him.

B. The Corporation desires the Employee to remain in the employ of the Corporation, and to compensate Employee for his service performed in the past by agreeing to make certain payments to Employee upon his retirement or disability, and to his spouse upon his death.

**NOW THEREFORE**, in consideration of the premises and promises contained herein, the parties do hereby agree as follows:

1.    PLAN NOT FUNDED OR QUALIFIED. This Agreement is intended to be (and shall be construed and administered as) an Employee Pension Benefit Plan under the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is unfunded and is maintained by the Corporation for the purpose of providing deferred compensation for Employee. More specifically, the Agreement is intended as a "top hat" plan under ERISA and is also intended as an unfunded Plan maintained primarily for the purpose of providing deferred compensation for Employee. The Agreement is not intended to be a qualified plan under Section 401(a) of the Internal Revenue Code of 1986, as amended.

The obligations of the Corporation to make the payments under this Agreement constitutes solely an unsecured (but legally enforceable) promise of the Corporation to make such payments, and no person, including Employee, shall have any lien, prior claim or other security interest in any property of Corporation as a result of this Agreement. No trust, either express or implied, will be established or maintained by Corporation for purposes of funding or paying benefits promised under this Agreement.

2.    EFFECTIVE DATE. The Effective Date (herein so called) of this Agreement for all purposes of Employee's rights to the deferred compensation shall be _7/3/03_, 2003.

3.    DEFERRED COMPENSATION.

a.    Upon Employee's termination of employment with the Corporation due to (i) retirement from service with the Corporation, (ii) Disability, as defined herein, or (ii) death, Corporation shall pay to Employee, and upon his death, to his spouse, a Joint and Survivor Annuity equal to Four Thousand Five Hundred Eighty Three and 33/100 Dollars ($4,583.33) per month. Said Joint and Survivor Annuity shall commence on the first day of the first calender month following said termination of employment, and shall continue on the

first day of each month thereafter for Employee's lifetime, and upon Employee's death, in the same amount to Employee's spouse for her lifetime.

        b.      For purposes of this Agreement, "Disability" shall mean the Employee (1) has been declared legally incompetent by a final decree (the date of such decree being deemed to be the date on which the disability occurred), (2) receives disability insurance benefits from any disability income insurance policy maintained by the Corporation or by the Employee, or (3) because of medically determinable disease, injury, or other mental or physical disability, is unable to perform substantially all of Employee's regular duties to the Company and that such disability is determined or reasonably expected to last at least twelve (12) months. The determination of disability under (3) above shall be based on the written opinion of the physician regularly attending Employee. If the Corporation disagrees with the opinion of this physician (the "First Physician"), it may engage at its own expense another physician (the "Second Physician") to examine Employee. If the First and Second Physicians agree in writing that Employee is or is not disabled, their written opinion shall be conclusive on the issue of disability.  If the First and Second Physicians disagree on the disability of Employee, the Physicians shall choose a third consulting physician (whose expense shall be borne by the Corporation), and the written opinion of a majority of these three physicians shall be conclusive as to Employee's disability. The date of any written opinion conclusively finding Employee to be disabled is the date on which the disability will be deemed to have occurred. In conjunction with a disability determination, Employee hereby consents to any required medical examination, and agrees to furnish any medical information requested by any examining physician and to waive any applicable physician-patient privilege that may arise because of such examination.  All physicians except the First Physician must be board-certified in the specialty most closely related to the nature of the disability alleged to exist.

        4.    <u>NON ASSIGNMENT.</u>  Employee hereby agrees that Employee shall have no rights to sell, assign, transfer, mortgage, alienate, pledge, hypothecate or in any way encumber or dispose, of Employee's right to receive the deferred compensation hereunder, nor shall any interest in amounts payable hereunder or in any payments, be subject to seizure for payment of any debts, judgments, alimony or separate maintenance, or be reached or transferred by operation of law in the event of bankruptcy, insolvency or otherwise, and any attempt to transfer an interest in the deferred compensation or other payment due hereunder in violation of this Agreement shall be ineffective, and shall thereby grant to the Corporation the option to terminate this Agreement without any further obligation thereunder to Employee or its successor or assigns.

        5.    <u>REMEDIES.</u>  The parties hereto understand and agree that irreparable injury would be caused to Employee and his spouse and to the Corporation by failure of a party to comply with the terms of this Agreement; that in the event of any actual or threatened default in or breach of any of the provisions in this Agreement, the party or parties who are aggrieved thereby shall have the right to specific performance and/or an injunction, as well as monetary damages and any other appropriate relief in law or in equity which may be granted by any court in the United States of America; and that all such rights and remedies shall be cumulative.

        6.    <u>NON INTERFERENCE WITH OTHER PLANS OR BENEFITS.</u>  Nothing in this Agreement shall in any way affect or interfere with Employee's rights or privileges under any other retirement, pension, profit sharing, bonus, insurance, hospitalization, or other employee

·benefit plan, now in effect or hereafter adopted, in which Employee is entitled to share or participate as an employee of the Corporation.

7.    WAIVER.  A party's failure to insist on compliance or enforcement of any provisions of this Agreement, shall not affect the validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement by that party or any other party.

8.    FURTHER ACTION.   The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes of the Agreement.

9.    PARTIES IN INTEREST.  Nothing herein shall be construed to be to the benefit of any third party, nor is it intended that any provision shall be for the benefit of any third party; provided, however, in the event that Employee's spouse is entitled to receive the benefits hereunder following Employee's death, such spouse shall be entitled to enforce her rights and remedies hereunder as if she was an original party hereto.

10.    SAVINGS CLAUSE.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of the Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

11.    ENTIRE AGREEMENT.  The parties hereto expressly acknowledge that this Agreement constitutes the entire contract between the parties concerning the subject matter hereof, and that unless otherwise provided in this Agreement, any other agreements or understandings, oral or written, of any nature with respect to such matters are hereby superseded and revoked.

12.    NOTICES.  Any and all offers, acceptances, consents, waivers and other notices required by this Agreement shall be deemed to be sent or delivered when personally delivered to the recipient or when mailed by certified or registered mail with proper first class postage attached thereto, to the parties hereto;

If to Corporation:    TEMPRITE CO.
                      *1555 HAWTHORNE LN,*
                      *WEST CHICAGO IL 60185*

If to Employee:       GEORGE SCHMIDT
                      11869 N. 114th Way
                      Scottsdale, AZ  85259

Any notice required to be made within a stated period of time shall be considered timely mailed if deposited before midnight of the first day of the stated period.

13.    TERMINATION.  This Agreement shall terminate upon the occurrence of any one of the following events:

-3-

    a.    The written agreement of the parties and, if Employee is married, Employee's spouse, to that effect;

    b.    The bankruptcy, receivership or dissolution of the Corporation; or

    c.    The termination of the Employee's employment with the Corporation and the payment of all of the deferred compensation, if any, due to Employee and his spouse hereunder.

D. THE SUBSEQUENT MARRIAGE OF THE DECEASED EMPLOYEE'S SPOUSE 7/13/03

14.    <u>AMENDMENT.</u> This Agreement may be altered or amended in whole or in part at any time by filing with this Agreement a written instrument setting forth such changes, duly signed by the Corporation and the Employee.

15.    <u>BINDING AGREEMENT.</u> This Agreement shall be binding not only upon the parties hereto, but also upon their heirs, executors, administrators, successors or assigns; and the parties hereby agree for themselves and their heirs, executors, administrators, successors or assigns, to execute any instruments and to perform any acts which may be necessary or proper to carry out the purposes of this Agreement. In that regard, Corporation expressly agrees that it shall not merge or consolidate into or with another company or sell substantially all of its assets to another company, firm or person until such company, firm or person expressly agrees, in writing, to assume and discharge the duties and obligations of the Corporation under this Agreement.

16.    <u>GENDER.</u> Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and other gender, masculine, feminine or neuter, as the context requires.

17.    <u>STATE LAW.</u> This Agreement shall be governed by the laws of the State of Arizona.

18.    <u>NAMED FIDUCIARY AND PLAN ADMINISTRATOR.</u> The "Named Fiduciary and Plan Administrator" of this plan shall be _Bob Brown_ until his resignation or removal by the Board of Directors. As Named Fiduciary and Plan Administrator, _Bob Brown_ shall be responsible for the management, control and administration of this Agreement as established herein. He may delegate to others certain aspects of the management and operation responsibilities of the plan including the employment of advisors and the delegation of ministerial duties to qualified individuals.

19.    <u>CLAIMS PROCEDURE AND ARBITRATION.</u> In the event a dispute arises over benefits under this Plan Agreement and benefits are not paid to the Employee (or to his spouse in the case of the Employee's death) and such claimant feels he or she is entitled to receive such benefits, then a written claim must be made to the Named Fiduciary and Plan Administrator named above within sixty (60) days from the date payments are refused. The Named Fiduciary and Plan Administrator and the Corporation shall review the written claim and if the claim is denied, in whole or in part, they shall provide in writing within ninety (90) days of receipt of such claim their specific reasons for such denial, reference to the provisions of this Agreement upon which the denial is based and any additional material or information is necessary to perfect the claim. Such written notice shall further indicate the additional steps to be taken by claimants if a further review of the claim denial is desired. A claim shall

be deemed denied if the Named Fiduciary and Plan Administrator fails to take any action within the aforesaid ninety-day period.

If claimant desires a second review, he or she shall notify the Named Fiduciary and Plan Administrator in writing within sixty (60) days of the first claim denial.  Claimant may review the Agreement or any documents relating thereto and submit any written issues and comments he or she may feel appropriate.  In his sole discretion, the Named Fiduciary and Plan Administrator shall then review the second claim and provide a written decision within sixty (60) days of receipt of such claim.  This decision shall likewise state the specific reasons for the decision and shall include reference to specific provisions of the Agreement upon which the decision is based.

If claimant continues to dispute the benefit denial based upon completed performance of the Agreement or the meaning and effect of the terms and conditions thereof, then claimant may submit the dispute to a Board of Arbitration for final arbitration.  Said Board shall consist of one member selected by the claimant, one member selected by the Corporation and the third member selected by the first two members.  The Board shall operate under any generally recognized set of arbitration rules.  The parties hereto agree that they and their heirs, personal representatives, successors and assigns shall be bound by the decision of such Board with respect to any controversy properly submitted to it for determination.


      **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement the day and year first above written.


**CORPORATION:**                      **EMPLOYEE:**

TEMPRITE CO., an

_____ "S" _____ corporation      _GEORGE SCHMIDT_

By: _____

Its: ___PRESIDENT_____

# EXHIBIT B



*Temprite*

1555 West Hawthorne Lane   West Chicago, Illinois 60185-1822 USA   *T:* 630-293-5910  *F:* 630-293-9594  *E:* temprite@temprite.com
800-552-9300                                              www.Temprite.com

July 25, 2003

<u>Certified Mail – Return Receipt Requested</u>

Top Hat Plan Exemption
Pension and Welfare Benefits Administration
Room N-5644
U S Department of Labor
200 Constitution Avenue NW
Washington  DC  20210

Attn: Secretary of Labor

Re: Temprite Company

Dear Sir or Madam:

Please be advised that Temprite Co., an S Corporation, has an agreement with a shareholder, and such agreement is determined to be a "plan" under ERISA, and would be an employee benefit plan primarily established and maintained for the purpose of providing a plan of deferred compensation and salary continuation to a select group of highly compensated employees.

Only one employee participates in this plan.

The employer is:

Temprite Company
1555 West Hawthorne Ln Ste 2E
West Chicago  IL  60185
EIN #36-3314664

This statement is filed under authority of Labor Regulations Section 2520.104-23.

Should you have any questions about the foregoing, please feel free to contact me at any time.

Sincerely,

Bob Brown
Secretary

Cc: George Schmidt

# EXHIBIT C

September 9, 2021

PATRICIA SCHMIDT
3247 S. Tehama Cir.
Flagstaff AZ 86005
Valleygirl737@icloud.com


**VIA EMAIL & FEDEX**
Bob Brown
Secretary & Treasurer
Temprite Company
1555 W. Hawthorne Lane, Ste. 1E
West Chicago, IL 60185
bbrown@temprite.com


RE:     **DEMAND FOR BENEFITS PURSUANT TO THE EMPLOYEE DEFERRED
        COMPENSATION AGREEMENT BETWEEN TEMPRITE AND GEORGE
        SCHMIDT**

Dear Bob Brown:

        I am writing to demand Temprite Company ("Temprite" or the "Company") comply with
the terms of the "Employee Deferred Compensation Agreement" executed by Temprite and
George Schmidt ("Mr. Schmidt" or "Employee") on July 3, 2003 (hereinafter referred to as the
"Deferred Comp. Agreement" or the "Plan"), a copy of which is provided for your reference and
attached as Exhibit A.   The Deferred Comp. Agreement provides that it is intended to be an
Employee Pension Benefit Plan under the provisions of the Employee Retirement Income Security
Act of 1974 ("ERISA").   *"Deferred Comp. Agreement,"* ¶ 1, p. 1, attached as Exhibit A.   More
specifically, "the Agreement is intended as a 'top hat' plan under ERISA", which is unfunded,
maintained by the Company for the purpose of providing deferred compensation to Mr. Schmidt,
who the Company describes as a "key employee and officer [who] made a significant contribution
to the Corporation's growth and success through long term service to the Corporation…during
years in which the Corporation was unable to adequately compensate him." *"Deferred Comp.
Agreement,"* Recital*:* ¶ A, p. 1 & ¶ 1, p. 1, attached as Exhibit A; 29 U.S.C.A. § 1051(2) (West)
(a top hat plan is "a plan which is unfunded and is maintained by an employer primarily for the
purpose of providing deferred compensation for a select group of management or highly
compensated employees"); *see also Garratt v. Knowles,* 245 F.3d 941, 946, fn. 4 (7th Cir. 2001)
(top hat plan is subject to ERISA's enforcement provisions even though it is exempted from
ERISA's vesting, participation, funding, and fiduciary rules); *and see Miller v. Heller*, 915 F.Supp.
651 (S.D.N.Y.1996) ("top hat plans" are subject solely to the reporting, disclosure, administration,
and enforcement portions of ERISA).

        As I explain below, after Mr. Schmidt died on August 9, 2020, I contacted Temprite
regarding the benefits promised to me in the Plan.   However, because I did not have a copy of the
Plan or know what my rights or benefits were, multiple Temprite executives denied the existence
of the Plan.   I am sure you inferred from the above paragraph that I have recently obtained a copy

September 9, 2021

of the Plan. It must be disconcerting to learn that I am now able to seek the benefits to which Temprite thought it had successfully deprived me, but it is probably more worrisome to be caught lying to one of Temprite's shareholders amid a series of misrepresentations Temprite has made in its ongoing effort to acquire my ownership interest in the Company at well-below fair market value.

I want to make it clear that I am not attempting to submit a claim for my benefits under the unreasonable, illegal, and wholly futile administrative claims process outlined in the Plan. As I explain below, your failure to issue a notice of adverse benefits determinations on September 1, 2020 and your false claim that the Plan never existed deprives you of the deference courts usually accord Plan Administrator's in making ERISA determinations. I am writing this letter as a courtesy prior to filing a claim in a United States Federal District Court. I am hoping you will realize that you have been caught in your lie and it is in the best interest of the Company and all of the Parties in Interest (which includes, at a minimum, you, Mr. Nonnie, and Tom Schmidt) to admit to the mistake, make a lump sum payment in the amount of $64,349.95 on or before October 31, 2021 ($59,583.29 for the 13 months of payments that were not issued, plus an 8% interest rate permitted to be applied to delayed benefit payments under ERISA), and begin issuing the monthly benefit payment to me on October 1, 2021, and every month thereafter until my death.

Because this is a pension plan that must be paid from the Company's assets, this claim would entitle me to discovery requests into the Company's books, records, accounts, minutes from Board of Directors meetings, loans, mortgages, dividends, executive compensation, stock certificates, among other things, which I know Temprite has gone to great lengths to keep me from seeing while negotiating the value of my shares. This is understandable in light of the fact that the few financial records I have been granted access to—the comparative financials from 2017—2020 prepared by Tom's personal accountant, Larry Lenard, contain enough information to suggest some very concerning issues that subject the Company, its corporate officers, and agents to an unreasonably high risk of liability for administrative fines, penalties, tax liens, civil liability and even criminal charges. The following represent just a few examples:

1. I reasonably believe that Temprite will lose its S-corp status, Litoralis, LLC (hereinafter "Litoralis," and Temprite's so-called "affiliate" company from which only Tom profits from) will lose its LLC status, and the entities will most likely be treated as common law partners, making the shareholders, member, and, possibly, corporate officers personally liable for any actions committed by either entity. It would not surprise me if the court ordered the companies to be dissolved, assets sold, and the businesses wound up.

2. It is fairly obvious that commingling of funds is occurring amongst the two entities— Litoralis is using Temprite's profits to pay for all of Litoralis' expenses and investments in property and even though Temprite spends approximately $500,000 per year on "leasehold improvements," $70,000 on real estate taxes, tens of thousands of dollars on maintenance, repairs and equipment for its leased property and an equal amount on maintenance for the whole building, Litoralis charges Temprite an inflated $342,689 in rent every year for property that Litoralis purchased with a loan from Temprite that Litoralis has *still* not paid back notwithstanding the fact that Litoralis' sole member, Tom, gives himself a six-

September 9, 2021

figure divestment every year on top of whatever salary he is paying himself and Litoralis only spends $36,000 total in rental expenses annually. Significantly, the market value to purchase the property outright is less than the amount Temprite spends in one year to rent the space, but Temprite continues spend these astronomical expenses on "rental property" because Litoralis uses Temprite's rent payments as collateral to secure additional mortgages for more property. Notably, Litoralis' and Temprite's financial reports are prepared together to limit Tom's income tax liability, however, Litoralis is profiting at the expense of Temprite, depriving Temprite's shareholders of millions of dollars in dividends, and none of Litoralis' profits or assets are reflected on Temprite's shareholder's K-1s that are also prepared by Tom's personal accountant.

3. The Company spends exorbitant amounts of money on personal expenses and claims them as business expenses. In addition to the lavish dinners that are not used to entertain clients or host business meetings, "business trips" that are actually personal vacations, it is, at best, a flagrant mismanagement of business funds, and, at worst, fraud, embezzlement, and tax evasion that management purchases multiple cars that cost hundreds of thousands of dollars each with the Company's profits and then claims the depreciation on them as Company assets even though they are not used for business purposes—or even located in the same state as the business!

4. I have reason to believe that Temprite intentionally refrained from following the fair market evaluation process provided for in the 2010 Share Purchase and Redemption Agreement because a neutral evaluator would have discovered the improprieties mentioned above, concluded the value of my shares were actually worth much more than Comstock represented, become aware that Temprite actually finished fiscal year 2020 in a better position than fiscal year 2019, and that Temprite would have significantly more funds available in its operating accounts if Temprite was not being used for the sole gain of Litoralis and purchasing expensive personal assets under the guise of business expenses.

5. I have reason to believe that Temprite is engaging in a pattern of behavior to deprive me of my benefits, ownership interests, and shareholder rights and privileges to deprive me of the fair and reasonable value of compensation I am actually owed and prevent me by any and all means from enforcing and protecting such rights in the hope that I will settle for less than I am entitled to collect and the Company will have one major shareholder who will earn a substantial windfall in the inevitable event he decides to sell the assets of the Company or merge with another entity—which Temprite cannot do without obtaining from the other entity its agreement in writing "to assume and discharge the duties and obligations of [Temprite] under this Agreement." *"Deferred Comp. Agreement,"* ¶ 15, p. 4, attached as <u>Exhibit A</u>.

In the event you decide to ignore, deny, or challenge my entitlement to benefits, I am providing a summary of the facts of the case and my likelihood of success on the merits. I strongly believe it would be in Temprite's best interest to comply with the terms of the Plan.

3

September 9, 2021

I.   **TEMPRITE INTENTIONALLY LIED ABOUT THE EXISTENCE OF THE
     DEFERRED COMPENSATION AGREEMENT**

Before Mr. Schmidt died, he informed me that I would receive a monthly salary payment
from Temprite after Mr. Schmidt died. Mr. Schmidt did not provide specific details—such as the
amount of the monthly payments or the duration of this benefit— and he did not show me a copy
of the Deferred Comp. Agreement or even disclose that it existed. After 25 years of marriage, I
knew that if Mr. Schmidt said that I would receive monthly payments from Temprite after he died
that he had made the appropriate arrangements to ensure I received those payments. Shortly after
Mr. Schmidt passed away on August 9, 2020, I called Temprite's President, Jim Nonnie. During
my call with Mr. Nonnie, I relayed to him Mr. Schmidt's statements regarding my entitlement to
continued monthly payments and made general inquiries as to when such payments would be
issued. I informed Mr. Nonnie that I needed the payments to be issued as soon as possible because
all of my bank accounts were frozen upon the death of Mr. Schmidt. Mr. Nonnie was ambivalent
about my financial predicament, steadfastly denied that I was entitled to any deferred
compensation payments, and claimed that Temprite did not have any agreement with Mr. Schmidt,
or any other employee, to provide the type of benefit I described.

Subsequently, I called you, Mr. Brown, and, once again, I explained my financial
predicament and repeated Mr. Schmidt's assurances to me that upon his death Temprite would
start to issue a monthly payment to me that Mr. Schmidt explained was a continuation of his salary.
Like Mr. Nonnie, you stated that Temprite did not have an agreement with Mr. Schmidt—or any
of its employees—to provide payments to his spouse upon his death. You also reviewed the
Company's accounts to see if there was money set aside to make these monthly payments to me.
You stated that there was no indication reflected in the ledger that I would receive monthly deferred
compensation payments, but that I was owed a $9,000 credit that you could not issue to me until
you obtained permission from the Chairman of the Board of Directors, and Mr. Schmidt's son,
Tom Schmidt.

I trusted you to tell the truth. You have worked for the Company for years; Mr. Schmidt
trusted you; as a corporate officer, you had multiple fiduciary duties obligating you to be forthright
with me, the Company's shareholder; and, because Tom had instructed the Company's staff and
agents to refuse to provide me with any Company records or information, I had no choice but to
believe you had been honest with me. As a direct result, I had to obtain cash advances out of my
own accounts at a 6% interest rate for months.

As an aside, despite the fact that this is a top hat plan under ERISA that does not subject
you to fiduciary liability, as noted above, the Plan is still subject to ERISA's reporting, disclosure,
administration, and enforcement provisions. Pursuant to 29 U.S.C.A. § 1132(c)(1)(B) the
administrator of a Plan can be held personally liable in the amount of $100 per day from the date
a beneficiary requests, and is refused, any information the beneficiary is entitled to receive under
ERISA, which includes a copy of the Deferred Comp. Agreement and any documents relevant to
the adverse benefit determination to deny issuing benefits on September 1, 2020.

Luckily, my granddaughter—a reputable corporate attorney licensed in Illinois and
California—recently moved in with me and offered to look into the current conflict with Temprite.

4

September 9, 2021

Wanting to be thorough, she asked to see any records Mr. Schmidt had kept over the years concerning the treatment of our separate and community property. Mr. Schmidt kept meticulous records that would have taken years to review, thus, after I sold my home, I packed the most important files and binders based on their labels and everything else was placed in storage. One of the binders had a label indicating that it contained all the relevant documents pertaining to a trust that was formed in 2003, most of which has been rendered obsolete over the past twenty years through subsequent testamentary instruments and other agreements. However, on August 20, 2021, my granddaughter discovered the Deferred Comp. Agreement with Temprite that Mr. Schmidt had filed towards the back of this large binder over eighteen years ago.

That evening, my granddaughter brought the Deferred Comp. Agreement with her to show me over dinner. After I confirmed I had never seen the Agreement before, she explained the general terms, which perfectly aligned with the arrangement Mr. Schmidt had described to me before his death, and which you denied existed. She informed me that Tom, who was President of the Company at the time, signed the Deferred Comp. Agreement on behalf of Temprite and that you, Mr. Brown, are not only identified as the "Named Fiduciary and Administrator" of the Plan, but you also prepared the "Reporting and Disclosure Statement" pursuant to Section 2520.104-23 of the Federal Code of Regulations—which provides an "Alternative Method of Compliance for Pension Plans for Selected Employees"—and filed the Reporting and Disclosure Statement with the U.S. Department of Labor on July 25, 2003, a copy of which is attached hereto as <u>Exhibit B</u>; *"Deferred Comp. Agreement,"* ¶ 18, p. 4, attached as <u>Exhibit A</u>.

As the Fiduciary and Administrator of the Plan you are responsible for managing, administering, and controlling the Plan, which includes ensuring the Company complies with the terms of the Plan, provides the Plan benefits to the beneficiaries, and ensures the Company is capable of making such payments—and because you opted to use the alternative form of compliance to avoid ERISA's extensive reporting and disclosure obligations, you were required to ensure the benefits would be paid either from (1) the general assets of the Company, (2) insurance contracts or policies, the premiums for which are exclusively paid by the Company, or (3) both. 29 C.F.R. § 2520.104-23(d). Furthermore, as the Treasurer, Secretary, and Director of Finances of Temprite, you are in the best position to ensure that benefit payments were issued on time following the termination of Mr. Schmidt's employment and your job duties—as well as your fiduciary duties as a corporate officer and certified public accountant—required you to ensure the Company's financial records and operating accounts reflected the potential liability of the benefit payments that would be paid in the event the Plan was triggered and/or payment of insurance premiums if you had reason to believe the Company would not be able to comply with the Deferred Comp. Agreement by relying on payments from the Company's assets alone.

Given your involvement in establishing the Plan, the onus of ensuring the Company complies with not just the Deferred Comp. Agreement, but also the ever-evolving statutes and regulations governing the Plan (ERISA, Department of Labor Regulations, Internal Revenue Code, state law, and federal case law, etc.) and the potential risk of being held personally liable for your failure to administer, maintain, and control the Plan, or breaching your fiduciary duties as a corporate officer in a close company, I find it incredibly difficult to believe that you did not know about the Plan. The more plausible inference is that you intentionally lied to me to avoid the Company's obligation to pay me the deferred compensation pursuant to the Plan. You knew that

September 9, 2021

I did not have a copy of the Agreement and I would not have any means to enforce my rights under the Plan if you claimed no such agreement existed.

## II.    TERMS OF DEFERRED COMPENSATION PLAN

In interpreting ERISA plans, courts are to "apply general principles of contract law under the federal common law guiding interpretation of ERISA claims." *Ruttenberg v. United States Life Ins. Co.,* 413 F.3d 652, 659 (7th Cir. 2005)). One such general principle is that a writing is to be construed as a whole, rather than by considering sections in isolation. Restatement (Second) of Contracts § 202(2). Another fundamental principle of contract law calls for such a document to be "interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1039 (7th Cir.1998).

Pursuant to the terms of the Deferred Comp. Agreement, Temprite agreed to pay Mr. Schmidt—and upon his death, to his spouse— a Joint and Survivor Annuity equal to Four Thousand Five Hundred Eighty-Three and 33/100 Dollars ($4,583.33) per month.   *"Deferred Comp. Agreement,"* ¶ 3(a), p. 1-2, attached as <u>Exhibit A</u>.  The Plan provided payment of the Joint and Survivor Annuity "*shall commence*" on the first day of the first calendar month following Mr. Schmidt's "Termination of Employment" and "*shall continue* on the first day of each month thereafter for Employee's lifetime, and upon Employee's death, in the same amount to Employee's spouse for her lifetime." *Id.* (Emphasis added.)   The Deferred Comp. Agreement limits the qualifying reasons for Termination of Employment, such that Mr. Schmidt and his spouse are eligible to receive the Annuity if the Termination was either due to (1) retirement from service with the Company, (2) disability, or (3) death. *Id.*

Pursuant to Mr. Schmidt's most recent IRS Form W-2 issued by Temprite for wages earned in 2020, George Schmidt was classified as an employee and earned $98,833 in gross wages from January 1, 2020, until his death on August 9, 2020. Consequently, George Schmidt's employment with Temprite terminated on August 9, 2020. Because Mr. Schmidt's Termination of employment with Temprite was due to one of the enumerated qualifying reasons—death—Temprite was automatically obligated to pay the first Annuity to me, his spouse, Patricia Ann Schmidt, on September 1, 2020 and continue to make such payments to me on the first day of each month thereafter until my death.

It is clear from the plain and unambiguous terms of the Deferred Comp. Agreement that Mr. Schmidt did not have to be alive upon or after his "Termination of Employment" to entitle me to the payments of the Survivor Annuity—if this were the case, then the "death" of Mr. Schmidt would not have been included as one of the three enumerated causes of "Termination of Employment" that triggered automatic issuance of benefit payments.  There is no other reasonable interpretation of this language that Temprite can hide behind to avoid its duties and obligations under the Plan.  Furthermore, the Deferred Comp. Agreement provides that "in the event that Employee's spouse is entitled to receive the benefits hereunder following Employee's death, such spouse *shall* be entitled to enforce her rights and remedies hereunder as if she was an original party hereto." *"Deferred Comp. Agreement,"* ¶ 9, p. 3, attached as <u>Exhibit A</u>.

September 9, 2021

Significantly, there are only two reasons which would have made me ineligible to receive the benefits conferred under the Plan, which are (1) Mr. Schmidt's separation from Temprite was due to a non-qualifying reason that did not meet the definition of "Termination of Employment," or (2) the Plan was terminated. As explained above, Mr. Schmidt satisfied the "Termination of Employment" clause, thereby satisfying our eligibility for benefits. Secondly, the Plan was never terminated. Significantly, the Deferred Comp. Agreement could only be terminated upon the occurrence of four enumerated events and two of those events were contingent upon my commission of one of the following actions: "(a) The written agreement of the parties *and, if the Employee is married, Employee's spouse,* [to terminate the Deferred Comp. Agreement; ... [or] (d). The subsequent marriage of the deceased Employee's Spouse." *"Deferred Comp. Agreement,"* ¶ 13(a) & (d), p. 3-4, attached as Exhibit A (Emphasis added). Clearly, I did not even know a written Plan existed and, thus, I never agreed in writing to terminate the Plan, and I have neither re-married, nor have any intention of doing so, since the passing of my late husband, Mr. Schmidt. The only other occurrences that could trigger termination of the plan— the dissolution/ receivership/ bankruptcy of Temprite or Temprite issuing a lump sum payment for all the deferred compensation contemplated by the Deferred Comp. Agreement following Mr. Schmidt's termination of employment—never occurred. *Id.* ¶ 13(b) - (c). Consequently, the Plan was never terminated, and I am entitled to enforce my rights and remedies under the Plan.

### III.   TEMPRITE BREACHED THE TERMS OF THE PLAN AND VIOLATED THE RULES AND REGULATIONS MANDATED BY ERISA

#### a.   TEMPRITE BREACHED THE TERMS OF THE PLAN

Temprite breached the terms of the Plan by failing to issue a benefit payment to me in the amount of Four Thousand Five Hundred Eighty-Three and 33/100 Dollars ($4,583.33) on September 1, 2020, and every month thereafter, as Temprite promised to do per month. *"Deferred Comp. Agreement,"* ¶ 3(a), p. 1-2, attached as Exhibit A. Significantly, the plain and unambiguous terms of the Deferred Comp. Agreement do not require the Participant, Mr. Schmidt, or Beneficiary, me, to make a claim for the Annuity payments; rather, multiple terms of the Deferred Comp. Agreement indicate Temprite was automatically required to issue the benefits upon the occurrence of Mr. Schmidt's Termination of Employment.

Firstly, the fact that the Deferred Comp. Agreement provides that the Annuity "shall commence" on a specific date and "shall continue" every month thereafter upon Mr. Schmidt's retirement, disability, or death indicates that Temprite's duty to issue the first Annuity on September 1, 2020, was a mandatory obligation and no further action was required. *See State ex rel. Brnovich v. Arizona Bd. of Regents*, 250 Ariz. 127, 476 P.3d 307, 312 (2020) (The term "shall" signifies a mandatory obligation or duty). This interpretation is bolstered by the fact that the Deferred Comp. Agreement uses the term "may" in the permissive sense elsewhere in the Deferred Comp. Agreement—e.g., Paragraph 19 provides that "the claimant may submit the dispute to a Board of Arbitration..."— and when the meaning of the terms "may" and "shall" are distinguished, "it is generally clear that 'shall' imposes a mandatory duty." *Kingdomware Techs., Inc. v. United States,* 136 S. Ct. 1969, 1977, 195 L. Ed. 2d 334 (2016).

September 9, 2021

Secondly, the "CLAIMS PROCEDURE AND ARBITRATION" provision anticipates that the claims procedure will only be resorted to <u>after</u> "a dispute arises over benefits under this Plan Agreement and benefits are not paid." *"Deferred Comp. Agreement,"* ¶ 19, p. 4, attached as <u>Exhibit A</u>. In other words, the Plan does not require a claim to be filed to initiate payments; a written claim need only be filed after the Plan Administrator does not pay the benefits owed under the terms of the Plan. *Id.* Significantly, the Plan does not have to notify the beneficiary that it has decided not to pay the benefits or disclose the reason the benefits were not issued, even though such failure to issue the benefit payment on the agreed-upon date (in this case, the first of the month) constitutes a "refusal," and, to preserve the right to receive the benefit, "a written claim must be made to the Named Fiduciary and Plan Administrator...within sixty (60) days from the date payments are refused." *Id.*

It is only after benefits are denied without explanation or notice of the Plan's claims procedure, and a written claim is submitted within 60 days of the Plan denying those benefits, that the Plan will engage in the claims procedure. To wit, the Deferred Comp. Agreement provides that upon receipt of the written claim in the prescribed timeframe, the claimant is entitled to the following:

> The Named Fiduciary and Plan Administrator and the Corporation shall review the written claim and if the claim is denied, in whole or in part, they shall provide in writing within ninety (90) days of receipt of such claim their specific reasons for such denial, reference to the provisions of this Agreement upon which the denial is based and any additional material or information is necessary to perfect the claim. Such written notice shall further indicate the additional steps to be taken by claimants if a further review of the claim denial is desired. A claim shall be deemed denied if the Named Fiduciary and Plan Administrator fails to take any action within the aforesaid ninety-day period.

> If claimant desires a second review, he or she shall notify the Named Fiduciary and Plan Administrator in writing within sixty (60) days of the first claim denial. Claimant may review the Agreement or any documents relating thereto and submit any written issues and comments he or she may feel appropriate. In his sole discretion, the Named Fiduciary and Plan Administrator shall then review the second claim and provide a written decision within sixty (60) days of receipt of such claim. This decision shall likewise state the specific reasons for the decision and shall include reference to specific provisions of the Agreement upon which the decision is based.

> If claimant continues to dispute the benefit denial based upon completed performance of the Agreement or the meaning and effect of the terms and conditions thereof, then claimant may submit the dispute to a Board of Arbitration for final arbitration. Said Board shall consist of one member selected by the claimant, one member selected by the Corporation and the third member selected by the first two members. The Board shall operate under any generally recognized set of arbitration rules. The parties hereto agree that they and their heirs, personal representatives, successors and

8

September 9, 2021

assigns shall be bound by the decision of such Board with respect to any controversy properly submitted to it for determination.

*Id.* at p. 4-5. Consequently, the above terms of the Plan all suggest that it had a mandatory obligation to begin administering benefits on September 1, 2020, and failure to do so constitutes a material breach of the terms of the Deferred Comp. Agreement and adverse benefits determination without any accompanying notice or explanation.

b.  <u>TEMPRITE FAILED TO ESTABLISH REASONABLE CLAIMS PROCEDURES IN VIOLATION OF ERISA</u>

Temprite failed to establish and follow reasonable claims procedures required by ERISA and, as such, I have exhausted my administrative remedies and am permitted to have my claims adjudicated by a United States Federal District Court.

Prior to addressing the failure of the plan to administer a reasonable claims process, I would like to point out that the Deferred Comp. Agreement expressly bestows my right to seek monetary and equitable relief from "any court in the United States of America" without requiring exhaustion of the claim procedure. *"Deferred Comp. Agreement,"* ¶ 5, p. 2, attached as <u>Exhibit A</u>. Paragraph 5 of the Plan explicitly provides the following:

> The parties hereto understand and agree that irreparable injury would be caused to Employee and his spouse and to the Corporation by failure of a party to comply with the terms of this Agreement; that in the event of any actual or threatened default in or breach of any of the provisions in this Agreement, the party or parties who are aggrieved thereby shall have the right to specific performance and/or an injunction, as well as monetary damages and any other appropriate relief in law or in equity which may be granted by any court in the United States of America; and that all such rights and remedies shall be cumulative.

*Id.* Consequently, even in the absence of exhausting my administrative remedies, the parties' clear intent was to permit the parties to seek redress in a court of law.

Notwithstanding my right to file my claim in court granted by the Plan, Section 503 of ERISA provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall –
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

9

September 9, 2021

29 U.S.C.A. § 1133. The Department of Labor's regulations set forth "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants)." 29 C.F.R. § 2560.503-1(a). The claims procedure requirements apply to every nonexempt employee benefit plan, including top hat plans. *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 217 (2d Cir. 2006) ("Top hat plans are exempt from many provisions of ERISA ... but like qualified plans, they are subject ... to the duty to have a claims procedure."). "[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan." 29 C.F.R. § 2560.503-1(l)(1); *Hoak v. Plan Adm'r of Plans of NCR Corp.*, 389 F. Supp. 3d 1234, 1270–71 (N.D. Ga. 2019).

The claims procedures for a plan will be deemed to be reasonable only if… "(3) The claims procedures do not contain any provision, and are not administered in a way, that unduly inhibits or hampers the initiation or processing of claims for benefits." 29 C.F.R. § 2560.503-1(b)(3). The fact that, pursuant to the Plan, a claim has to be filed within 60 days' of a refusal to pay benefits and no notice of the denial of benefits, the claims process, my rights under ERISA, or any other information, such as a copy of the Plan, is provided to a beneficiary does not merely inhibit or hamper the initiation or processing of a claim, it makes the claim process completely inaccessible and *per se* unreasonable.

The plan administrator shall provide written or electronic notification of any adverse benefit determination, which must include, among other things, the reason for the adverse benefit determination. 29 C.F.R. § 2560.503-1(g)(1). In turn, "adverse benefit determination" means "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, or termination of, or a failure to provide or make a payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan…" 29 C.F.R. § 2560.503-1(m)(4). Consequently, the Plan's failure to make the mandatory benefit payment on September 1, 2020, following Mr. Schmidt's death, constituted an adverse benefit determination that required the plan administrator to send me the written notification required by 29 C.F.R. § 2560.503-1(g)(1).

The claims process is also unreasonable because the Plan's appeal and arbitration process are patently unreasonable and non-compliant with the regulations provided insofar as the claims process requires <u>four</u> levels of review—instead of the maximum <u>two</u> levels permitted by the regulations—and permits voluntary arbitration of the dispute, but provides that the arbitration decision will be final, rather than subject to appeal to a federal court pursuant to Section 502 of ERISA.

Significantly, "failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies available under Section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l)(1).

September 9, 2021

I also have ample substantive facts to support my belief that pursuing a resolution through Temprite's administrative scheme would be a futile effort meant to prolong recuperation of the money I am owed, only to be arbitrarily and capriciously denied my claim and subjected to an arbitration that deprives me of my right to seek review of the administrative record by a federal court because the Agreement requires the decision of the arbitration to be accepted as the final ruling on the claim. I would spend more money on attorney fees than the amount Temprite currently owes me if I were to participate in your biased, non-compliant claims dispute process, whereas bringing my claim in federal court at least offers the opportunity to recoup those attorney fees if, and when, I am successful on my claim.

In light of the above, I am well within my rights to file multiple claims under 29 U.S.C.A. § 1132 seeking my benefits plus interest, civil penalties, attorneys fees, and all other equitable and compensatory relief to which I am entitled under ERISA and as a shareholder of Temprite.

## IV.    CONCLUSION

Given the contentious status of the parties, I have gone above and beyond to convince you of the futility and needless expense of litigating this claim in court. However, I will be prepared to file a Complaint against the Plan on October 2, 2021, if I do not receive my benefit payment on October 1, 2021. Please respond in writing, via email or at the address provided on page one, by September 27, 2021, to indicate if you plan to comply with the demand for monthly benefits and the lump sum payment pursuant to the timeline I have requested at the top of the letter. Failure to respond will be interpreted as a denial of my offer. Please note that the resolution of this claim has no bearing on any other pending claims I have against Temprite or its leadership or the value of my remaining stock ownership.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK. SIGNATURE PAGE FOLLOWS.]**

September 9, 2021

Very truly yours,

Patricia A. Schmidt

DATE: Sept. 9, 2021

# EXHIBIT D

**Frazer Ryan
Goldberg &
Arnold LLP**

September 30, 2021

Our File No. 104975.000

James W. Ryan*
John R. Fitzpatrick*
Scott A. Erickson**
T.J. Ryan*
Marsha Goodman**
Jonathon M. Morrison**
Joshua D. Moya*
Lisa Reilly Payton**
Douglas S. John**
Joshua N. Mozell**
Brandon A. Keim**
Philip R. Rupprecht**
David R. Cohen**
Michael A. Harsch
James E. McDougall
Cathy L. Knapp
Barbara R. Berman
Philip B. Whitaker
Tobias C. Pierce
Colleen C. Thomas
Jessica L. Dorvinen
Alyssa B. Whetstine
Robert M. Bartels

David R. Frazer⁺
Yale F. Goldberg⁺
Charles L. Arnold⁺

Charles W. Whetstine
- Of Counsel -
Whetstine Law Firm, P.C.*

*Professional Corporation
**Professional LLC
⁺Emeritus

**VIA EMAIL lrb@tblaw.com
AND REGULAR U.S. MAIL**

Lance R. Broberg, Esq.
TIFFANY & BOSCO, P.A.
2525 East Camelback Road
Phoenix, Arizona   85016

  *Re:   Pat Schmidt*

Dear Lance,

  I am writing in response to your email of September, 24, 2021. Tom Schmidt and Temprite will agree to forego the waiver and release in the Redemption Agreement. The remaining aspects of Pat Schmidt's ("Pat") demands are rejected, in full. Accordingly, I have attached for your client's signature the Redemption Agreement, Promissory Note, Stock Pledge Agreement, and Assignment.

  The Parties have agreed on a price of $1,000 per share and Pat already was paid one million dollars based on this agreement. The Share Purchase and Redemption Agreement requires Pat, in paragraph 6(c), to sell her inherited shares and to be paid in 48 equal consecutive monthly installment payments. Also, please note that Pat is required to release shares from the Pledge Agreement "pro rata as the principal of the Note is paid." See paragraph 6(d) of the Share Purchase and Redemption Agreement. The attached agreements correspond to these requirements.

1850 North Central Avenue
Suite 1800
Phoenix, Arizona 85004

602.277.2010
Fax 602.277.2595
www.frgalaw.com

Law Offices
**Frazer Ryan Goldberg & Arnold LLP**

Lance R. Broberg, Esq.
Thursday, September 30, 2021
Page 2

Back in October and November, 2020, Temprite and Tom Schmidt gave Pat the option of waiting for six months or so to see what might transpire and happen to the Company before reaching an agreement. Pat was provided the option – proceed with the information then known or wait and benefit from knowing what had happened. Pat decided to forge ahead. The fact Temprite busted its proverbial "rear end" and made "lemonade out of lemons" is a testament to the hard work, dedication, and acumen of the employees and officers of Temprite, along with a healthy dose of raw, unadulterated luck. It certainly had zero to do with her baseless assertions of wrongdoing.

Pat's demands therefore are rejected, except she is free to bring an arbitration claim in DuPage County. Or, she is free to sue in Federal Northern District Court in Illinois to enforce what she thinks is a binding Deferred Compensation Agreement. Or Pat can bring both. She also can sue the individuals, but we trust Pat and her Illinois counsel will carefully understand the prospect of sanctions under Federal Civil Procedure Rule 11, and applicable Federal and Illinois laws, before doing so. Suing the individuals will be baseless.

I hope Pat realizes her granddaughter is ill-suited to represent her in such serious cases, let alone to evaluate these matters. I hope Pat grasps the very real and very significant risk that she may lose and will be forced to reimburse Temprite hundreds of thousands of dollars in its accounting fees, legal fees, court costs, and arbitration costs. In addition, due to her breach, Temprite will seek, among other things, to be excused from its obligation to pay her anything for her inherited shares and to cancel those shares, and will seek damages should her intransigence undermine the redemption of shares from Arizona State University's Foundation.

Temprite also will insist on repayment, up front, as a condition of proceeding with any court or arbitration claim, of the entire one million dollars should Pat decide to renege on the $1,000 per share price. (Note that Temprite had no obligation to pay Pat for her shares in one payment but did so as part of the good deal she received; if she wishes to renege, then she can return on the benefits she received, too.) Pat also should know that Temprite believes a thorough valuation as of August 9, 2020 will result in a per share price closer to $800.

Additionally, please remind Pat the Deferred Compensation Agreement was shelved in lieu of her receiving 1,000 shares of stock in Temprite. Does Pat wish to return her million dollars she was paid for this stock and enforce the Deferred Compensation Agreement instead? Does Pat think she gets both?

Law Offices
**Frazer Ryan Goldberg & Arnold LLP**

Lance R. Broberg, Esq.
Thursday, September 30, 2021
Page 3


Temprite and Tom Schmidt find it very unfortunate Pat is being talked into an incorrect legal and factual argument by her granddaughter, apparently. The long agreed-upon proposal is a good deal for Pat; she is being unwise to breach her commitments. Pat apparently is being talked into risking having to pay hundreds of thousands of dollars in her own legal and accounting fees to bring one or two speculative ventures in which she is facing staggering losses should she not prevail. Pat will spend the next few years in Court or arbitration, win or lose. And, her chances of success do not appear to be very good, either. Temprite and Tom Schmidt encourage Pat to reconsider this path – Pat is being treated fairly by Tom and Temprite and Pat is on the cusp of wrapping this matter up.

**Please provide to me signed agreements, as attached, no later than the close of business Tuesday, October 5, 2021.**

Refusal to do so will be treated as a material breach of the Share Purchase and Redemption Agreement and Temprite will seek in arbitration in DuPage County, Illinois, among other things, a determination that its obligation to pay for the inherited shares is excused and an order authorizing Temprite to cancel those shares (assuming this is authorized under Illinois law), together with recovery of all of its legal and accounting fees, and all arbitration related costs.

In closing, Temprite and Tom Schmidt remind Pat that she has a good, fair deal. Pat needs to honor the commitment she made. They worry she is receiving poor advice. I hope to hear from you shortly.

Very truly yours,

**FRAZER, RYAN, GOLDBERG & ARNOLD, L.L.P.**

Philip B. Whitaker


PBW/tlc
Encls.
cc:    Mr. Thomas Schmidt

# REDEMPTION AGREEMENT

This REDEMPTION AGREEMENT (this "Agreement") is entered into and is effective as of _____, 2021 (the "Effective Date"), between TEMPRITE COMPANY, INC., an Illinois corporation (the "Company"), and PATRICIA ANN SCHMIDT, a resident of the State of Arizona, ("Pat"). The Company and Pat are sometimes referred to herein together as the "Parties" and each individually as a "Party."

## RECITALS

A.    George Schmidt owned 1,631 shares in the Company, comprising Thirty-Seven and Forty-Nine Hundredths percent (37.49%) of the issued and outstanding shares of stock in the Company. George Schmidt's shares of stock are reflected in Stock Certificate Number 24.

B.    George Schmidt, Pat, and the Company are parties to that certain Share Purchase and Redemption Agreement dated as of August 30, 2010 (the "Shareholders' Agreement").

C.    Pursuant to a Fourth Codicil to the Last Will and Testament of George Schmidt, dated February 7, 2020, George Schmidt bequeathed one-third (1/3) of his shares (543.66) each to Pat; to his son, Thomas Joseph Schmidt ("Tom Schmidt"); and to the WP Carey School of Business at Arizona State University ("ASU").

D.    George Schmidt passed away on August 9, 2020, and on December 10, 2020, Schmidt filed an Application for Informal Probate of Will and Appointment of Personal Representative. Pat was appointed Personal Representative on December 14, 2020 for the Estate of George Schmidt (the "Estate").

E.    On _____, Pat in her capacity as Personal Representative of the Estate assigned the 543.66 shares bequeathed to Pat by George Schmidt (the "543.66 Shares") to Pat in her individual capacity.

E.    The Company agrees that it will redeem the 543.66 Shares at a price of $1,000.00 per share.

F.    Pat agrees that she shall transfer the 543.66 Shares to the Company and the Company agrees to redeem the 543.66 Shares from Pat subject to the terms and conditions of this Agreement.

G.    Upon distribution by the Estate of the 543.66 Shares to Pat, the Company

will cancel Stock Certificate Number 24 and issued a new Certificate for Pat in the amount of 543.66 Shares, Certificate Number _____, and a new Certificate for ASU in the amount of 543.66 Shares, Certificate Number _____.  The Company will thereafter redeem and otherwise acquire the 543.66 Shares to Pat pursuant to the terms of this Agreement as well as the  related and incorporated promissory note and stock pledge agreement.

**AGREEMENT**

**NOW, THEREFORE**, adopting the Recitals as set forth fully herein, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     **Redemption of Shares.**

(a)     **The 543.66 Shares.**  As of the Effective Date, the Company hereby redeems from Pat and Pat hereby conveys, sells, transfers, and assigns to the Company the 543.66 Shares free and clear of any and all Liens, with the exception of the Stock Pledge Agreement, in the form attached as **Exhibit A,** and a Promissory Note in the form attached as **Exhibit B** (the "Note"). Upon the Parties' execution of this Agreement, Pat shall execute and deliver to the Company a fully and duly executed Assignment of Shares, and an endorsement of Stock Certificate Number _____, which shall be in the form attached hereto as **Exhibit C** (the "Assignment of Shares").

(b)     As used herein, "Lien" means any mortgage, lien (statutory or otherwise), security interest, charge, adverse right, interest or claim, pledge, license, option, conditional sales contract, assessment, levy, easement, covenant, condition, reservation, hypothecation, restriction, title defect, exception, limitation, charge, possibility of reversion, right of refusal, voting trust or agreement, proxy, marital or community property interest, or encumbrance of any nature whatsoever.

(c)     **Price.**  The Company shall pay $1,000 per share for the 543.66 Shares, subject to the terms and conditions as set forth in this Agreement.

(d)     **Payment Terms.**  The Company shall provide the Note, secured by the Stock Pledge Agreement, in the forms attached as Exhibits A and B, in consideration for transfer of the Shares. The Promissory Note shall require the Company to commence to pay to Pat Five Hundred Forty-Three Thousand, Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($543,666.66) for the 543.66 Shares on or before October 1, 2021, in 48 equal monthly installments.

The Note shall have a "due on sale" clause and an acceleration clause in the event of default, and the Note shall require interest at the prime rate as published by the Wall Street Journal, adjusted annually on the anniversary of the Effective Date. No interest will accrue until the Effective Date set forth in each of the Notes.

   **(e)    Consent to Redemption; Waiver.**  The Company hereby consents to the redemption of the 543.66 Shares as set forth herein. Further, the Parties hereto agree that any conditions to the redemption of the Shares set forth in the Shareholder's Agreement are hereby waived. The Parties hereby authorize the President of the Company to amend the Company's Articles of Incorporation, and all other Company documents, to the extent it might become necessary, to reflect the assignments and transfers made hereby.

   **(f)    No Shareholder Rights.**  As of the Effective Date, Pat shall retain no rights, interest, or title in, or to any of the 543.66 Shares except as expressly set forth in the Stock Pledge Agreement and the Note. Except as specifically set forth in the Stock Pledge Agreement and the Note, Pat shall have no further right, interest, or expectation in or with respect to any voting, information, distribution, remuneration, dividend, liquidating distribution, non-liquidating distribution, fee, salary, guaranteed payment, bonus, or any payment of any form or kind whatsoever from the Company, its officers, directors, or shareholders (the Company and all such other parties arc collectively, the "Company Parties"). The Company agrees to file all tax returns, reports and other forms for the 2020 and 2021 tax years in a manner consistent with the provisions of this Agreement as determined by the Company and the regularly engaged tax accountants for the Company whose determination shall be conclusive on the Parties.

   **(g)    Tax Treatment.**

   The Parties hereby agree that Pat shall receive no tax allocations or distributions as of and after the Effective Date. The Parties additionally agree upon a Specific Accounting Election, to be determined at the end of the 2021 year, in the discretion of the Company.

**2.    Termination of Rights as a Shareholder.**

   As of the Effective Date, except as set forth in the Stock Pledge Agreement and the Note, Pat will (i) own no interest whatsoever, contingent or otherwise, in the Company, (ii) cease to be a Shareholder of the Company (and shall be deemed to have withdrawn as a Shareholder) and, accordingly, shall cease to have any rights whatsoever as a Shareholder of the Company (including any right to receive information, to vote, and to receive further distributions of cash or other assets from the Company, whether relating to previously accrued or future income of the Company), and (iii) without any further action required by any of the Parties, be deemed to have resigned from all positions in the Company and any other authorized representative or agent of the Company, and the Company hereby accepts

all such withdrawals and resignations.

**3.    Representations and Warranties.**

Each Party hereby represents and warrants to each of the other Parties as follows: (i) this Agreement has been duly executed and delivered by such Party and constitutes a valid and legally binding and enforceable obligation of such Party in accordance with its terms; (ii) the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and the compliance with the terms hereof by it, do not, or will not conflict with or result in a breach of any terms of, or constitute a default under, any material agreement, obligation, or instrument to which such Party is a party or by which it is bound; and (iii) such Party has been advised and given the opportunity to seek advice from its own respective legal counsel and other independent professional advisors with respect to this Agreement.

Pat further represents and warrants that at no time was she ever an employee of the Company, an agent of the Company, or an independent contractor of the Company.

**4.    Restrictive Covenants.**

**(a)    Company Intellectual Property.**  The Parties hereby agree that Pat retains no right, interest, or title in or to the Company's Intellectual Property (any work created by, for, or on behalf of the Company that is the result of activity for which the Company could have or did apply for a patent, copyright, or trademark, whether or not the Company did apply for patents, copyrights, or trademarks for such work, or designs, geographical indications, or trade secrets. Pat shall not, directly or indirectly, license or assist in any manner, to any third party in licensing or obtaining any other rights whatsoever in or to any patents or other intellectual property which is similar to or otherwise competes with any Company's Intellectual Property as identified in Illinois law.

**(b)    Confidential Commercial Information.**  From and after the Transfer Date hereof, Pat shall not directly or indirectly, disclose, utilize, or authorize any disclosure or use of the Company's Confidential Information (as defined below). For purposes of this Agreement, "Confidential Information" includes, but is not limited to, the following non-public information relating to the Company's Business: (i) customer lists, data and information compiled on behalf of the Company; (ii) internal practices and procedures, contact or other identifying information regarding Company personnel, customers, suppliers, vendors, or contractors; (iii) financial condition and financial results of operations, including any appraisal of the value of the Company; (iv) information relating to processes, computer programs, source codes, databases, schematics, patents, licenses, inventions, creations, calculations, drawings, models, renderings, original works of authorship, analyses, compilations, studies, or other subject matter relating to strategic

REDEMPTION AGREEMENT
Page 4 of 11

planning, operations, management, funding, budgeting, finance, marketing, distribution, licensing, and selling activities; and (v) any and all information, without regard to form, having independent economic value to the Company that is not generally known to, and not readily ascertainable by proper means by a person who can obtain economic value from its disclosure or use. Excluded from this definition is information that is required to be disclosed by order of a court or other governmental agency; provided that the Company shall first be given reasonable notice and opportunity to obtain a protective order against disclosure of such information.

**(c)** **Non-Disclosure of Agreement.** Except as expressly contemplated by this Agreement, no Party hereto shall discuss or disclose, whether orally or in writing, this Agreement or any of its material terms with or to any Person not signing this Agreement, with the exception of spouses, attorneys, advisors, or officers, directors, or shareholders of the Company or except as may be required by law; provided that the Parties may disclose that the 543.66 Shares in the Company were redeemed and all matters related thereto are resolved between the Parties. The Parties agree that this Agreement and any related Agreements may be provided by the Parties to ASU in the course of redeeming the ASU Shares and pursuant to PR's duty as personal representative.

**(d)** **Return of Company Property and Information.** Pat acknowledges and agrees that, except as expressly set forth herein and to the best of her knowledge, she has returned all Company-related documents and records, including but not limited to financial records, customer lists, and vendor lists (electronic, paper or otherwise), materials, software, equipment, and other physical property, and all copies of the foregoing, whether or not otherwise containing confidential and proprietary information, that have come into her possession or have been produced by such Parties in connection with her or George Schmidt's affiliation with the Company.

**5.** **Miscellaneous.**

**(a)** **Amendments.** This Agreement may be amended, supplemented, or otherwise modified only by a writing signed by each of the Parties.

**(b)** **Entire Agreement.** This Agreement, together with the exhibits attached hereto and incorporated herein by this reference, contains the entire agreement of the Parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions.

**(c)** **Further Acts.** Each Party hereby covenants and agrees to cooperate fully in the effectuation of the transactions contemplated hereby and to execute and deliver any and all additional documents and instruments and take such additional action as any other Party

may reasonably request to document and give effect to the transactions contemplated hereby.

**(d)    Governing Law.**  This Agreement is governed by, and will be construed and enforced in accordance with, the laws of the State of Arizona without regard to its conflict of laws rules.

**(e)    Severability.**  Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**(f)    Successors and Assigns.**  All covenants, agreements, representations, and warranties of the Parties contained herein will survive the closing of the transactions contemplated herein and be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors, and assigns.

**(g)    Preparation of Document.**  The Parties have participated jointly in the negotiation and drafting of this Agreement. If a question of interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. This Agreement was prepared by Philip B. Whitaker, Esq., of Frazer, Ryan, Goldberg & Arnold, LLP as legal counsel to Tom Schmidt and the Company. The other Parties each acknowledge that they have been advised to consult with their own independent legal counsel with respect to this Agreement.

**(h)    Attorneys' Fees.**  In the event of any claim, controversy, or dispute arising out of or relating to this Agreement, or the breach thereof, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses incurred in connection with any court or arbitration proceeding.

**(i)    Notices.**  All notices, requests, demands, claims, and other communications permitted or required to be given hereunder must be in writing and will be deemed duly given and received (i) if personally delivered, when so delivered, (ii) if mailed, three (3) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below, or (iii) if sent through same-day or overnight delivery service in circumstances to which such service guarantees next day delivery, the day following being so sent:

If to Pat:

Lance R. Broberg, Esq.
TIFFANY & BOSCO
2525 East Camelback Road, 7th Floor
Phoenix, Arizona 85016

If to the Company:

Philip B. Whitaker, Esq.
FRAZER, RYAN, GOLDBERG
& ARNOLD, LLP
1850 North Central Avenue, Suite 1800
Phoenix, Arizona 85004

If to PR or the Estate of
George: Schmidt:

Lance R. Broberg, Esq.
TIFFANY & BOSCO
2525 East Camelback Road, 7th Floor
Phoenix, Arizona 85016

Any Party may change its address for the receipt of notices and other communications hereunder by giving the other Parties reasonable advanced written notice of such change in the manner herein set forth.

(j)     **Mediation.**  In the event of a dispute between or among the Parties with respect to this Agreement, such disputing Parties, prior to filing a claim with any arbitrator or court, agree to first submit such dispute to non-binding mediation. Such non-binding mediation shall be conducted by a mutually acceptable mediator within thirty (30) days from the receipt of a written notice of dispute issued by any Party hereto. If the disputing Parties are unable within such thirty (30) day period nominate a mutually agreeable mediator, then either Party may request that the American Arbitration Association appoint a mediator and the mediator shall be contracted pursuant to the Commercial Mediation Procedures of the American Arbitration Association to resolve the dispute pursuant to non-binding mediation, then any Party may proceed to exercise any right to which such Party may be entitled under applicable law.

(k)     **Definitions.**  For purposes of the Agreement, (A) "Business Day" means any day other than a Saturday or Sunday or any other day on which banks in Arizona are permitted or required by applicable law to be closed: (B) "Person" means any individual, firm, corporation, partnership, limited liability company, trust, estate, association or other legal entity; (C) "Affiliates" means, with respect to a Person, (i) any spouse, ascendant, descendent, or collateral relation who is a second cousin or closer, whether by blood, adoption, or marriage; (ii) any Person directly or indirectly controlling, controlled by, or under common control with such Person; (iii) a Person owning or controlling 10% or more of the outstanding voting securities of such other Person; (iv) any officer, director, trustee,

REDEMPTION AGREEMENT
Page 7 of 11

manager, member or partner of such Person; and (v) if such other Person is an officer, director, trustee, manager, member or partner, any Person for which such Person acts in any such capacity. "Control," "controlled," and "controlling" means the power to direct or cause the direction of the management and policies of a Person, and shall be deemed to exist if any Person directly or indirectly owns, controls, or holds the power to vote fifty-percent (50%) or more of the voting securities of such other Person.

      **(l)**    **Waivers.**  The due performance or observance by the Parties of their respective obligations under this Agreement will not be waived, and the rights and remedies of the Parties hereunder will not be affected, by any course of dealing or performance or by any delay or failure of any Party in exercising any such right or remedy. The due performance or observance by a Party of any of its obligations under this Agreement may be waived only by a writing signed by the Party against whom enforcement of such waiver is sought, and any such waiver will be effective only to the extent specifically set forth in such writing.

      **(m)**    **Counterparts.** This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument. Signatures of the parties transmitted by facsimile or electronic transmission (e.g., .pdf) shall be deemed to be their original signatures for all purposes.

      **(n)**    **Time is of the Essence.** Except as may be excused by the Parties in writing or as excused by operation of law, time is of the essence.

      **(o)**    **Reasonableness and Materiality.**  All terms and conditions in this Agreement are subject to concepts of "commercial reasonableness" and of "materiality."

      **IN WITNESS WHEREOF**, the Parties have duly executed this Redemption Agreement as of the Effective Date.

**COMPANY:**                     **PATRICIA ANN SCHMIDT:**

**TEMPRITE COMPANY, INC.**

**By:** _____      **By:** _____
      **TOM SCHMIDT**                     **PATRICIA ANN SCHMIDT**

**Its:** _____

**EXHIBIT A**
**STOCK PLEDGE AGREEMENT**

**EXHIBIT B**
**PROMISSORY NOTE**

**EXHIBIT C**
**ASSIGNMENT OF SHARES**

## CARRY BACK PROMISSORY NOTE
## (SECURED)

$543,666.66                                          _____, 2021
                                                    Phoenix, Arizona

     TEMPRITE COMPANY, INC., an Illinois Corporation ("MAKER"), promises to pay to "PATRICIA ANN SCHMIDT," an individual ("PAYEE"), the sum of FIVE HUNDRED FORTY-THREE THOUSAND, SIX HUNDRED SIXTY-SIX DOLLARS AND SIXTY-SIX CENTS ($543,666.66). Maker shall make 48 consecutive monthly payments on the principal to Payee in the amount of $11,326.39 each, due on or before the first calendar day of each month, commencing on October 1, 2021 (the "Effective Date") and continuing until paid in full. In addition, each month with the payment of principal, Maker shall pay Payee simple interest on the unpaid principal balance of this Note, at the prime rate as published in the Wall Street Journal as of the date of this Note, to be adjusted on each annual anniversary of the date of this Note. No interest shall accrue before the Effective Date.

     If payment is not received by Payee on or before the tenth (10th) calendar day of any month when a payment is due, Maker shall pay Payee, in addition to the monthly principal amount and interest amount due, late payment interest at the rate of eight percent per annum (8%) on the delinquent principal amount, together with a late fee of $250.00. Late payment interest shall be due and payable without notice and will continue to accrue until the

CARRY BACK PROMISSORY NOTE
Page 1 of 3

delinquent principal, late payment, and applicable interest is paid. This Note shall not be in default, and subject to acceleration as set forth below, unless and until Maker has failed to make one or more monthly payments, Payee notifies Maker in writing of the non-payment, and Maker fails to make payment of the delinquent principal, late payment, and interest past due under this Note within five (5) business days receipt of written notice of non-payment by Payee, not counting the day of receipt of the notice.

The unpaid principal due under this Note may be paid in whole or in part at any time or from time to time by Maker without penalty.

This Note is made to pay for the transfer from Payee to Maker of 543.66 shares of the Common Stock of Maker, is secured by a pledge of 543.66 shares of the Common Stock of Maker owned by Payee, and a certificate of which evidencing such ownership shall be held in trust by Maker for the Payee of this Note (the "Stock Pledge Agreement"). As payment is made on the Note, the Payee hereby authorizes the Maker, after every six month period, to record the transfer on its books and records of the pro rata amount of Pledged Shares reflected by and in each payment received during the prior six month period, and Payee hereby consents to the release from the Stock Pledge Agreement the amount of such Pledged Shares. Maker shall send to Payee, after each six month period, a statement showing the amount of shares removed from the Pledge Agreement and the number of shares which remain subject to the Pledge Agreement.

CARRY BACK PROMISSORY NOTE
Page 2 of 3

This Note requires acceleration and payment in full if the stock or substantially all of the assets of Maker are sold or otherwise transferred to a third party.

This Note requires acceleration and payment in full if Maker fails to make full payment as due within five (5) business days after notice of non-payment by Payee, but Payee shall elect whether to accelerate the amounts due on this Note or to exercise her rights under the Stock Pledge Agreement.

If a dispute arises under this Note and legal action or arbitration is commenced to enforce or interpret this Note, the prevailing party shall be entitled to an award of reasonable attorneys' fees, taxable costs, and out of pocket expenses incurred in the dispute.

This Note may not be assigned, hypothecated, or encumbered by Payee.


**TEMPRITE COMPANY, INC.**


By:_____

Its:_____

# STOCK PLEDGE AGREEMENT

THIS STOCK PLEDGE AGREEMENT (this "Agreement"), dated as of this \_\_\_\_\_ day of _____, 2021, is entered into by and between TEMPRITE COMPANY, INC., an Illinois corporation ("Pledgor"), and PATRICIA ANN SCHMIDT, an individual ("Secured Party").

## RECITALS

A.      Pledgor has executed that certain Promissory Note in the aggregate principal amount of Five Hundred Forty-Three Thousand, Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($543,666.66), dated of even date herewith, in favor of Secured Party (the "Note").

B.      Secured Party is the owner of 543.66 shares of Common Stock of Pledgor (the "Shares"), referenced on Stock Certificate \_\_\_ of Pledgor, which are transferred to Pledgor by Secured Party in exchange for the Note and this Agreement (the "Pledged Shares"). The Pledged Shares do not include other stock of Pledgor.

C.      Pledgor has agreed to pledge the Shares set forth on Stock Certificate No.\_\_\_, to Secured Party pursuant to the terms of the Note, and to enter into this Agreement in order to secure its obligations to Secured Party under the Note.

NOW, THEREFORE, in consideration of the foregoing promises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Pledge of Stock.**  Pledgor hereby pledges, grants a security interest in, assigns, transfers, and delivers unto Secured Party and her heirs, executors, successors, and assigns the Pledged Shares as collateral security for the payment and performance by Pledgor of the Obligations (as defined under Section 2 hereof). Pledgor will maintain in possession of the Pledged Shares in trust for Secured Party under this Agreement, to be released to Pledgor only upon payment of the Note. The Pledged Shares shall be referred to herein as the "Collateral."

2.      **Obligations Secured.**  This Agreement is made and the pledge herein is given to secure Pledgor's payment and performance of any and all obligations, liabilities and indebtedness of Pledgor to Secured Party pursuant to the terms of the Note and this Agreement (collectively, the "Obligations"). Secured Party shall have no further right,

interest, or expectation in or with respect to any voting, information, distribution, remuneration, dividend, liquidating distribution, non-liquidating distribution, fee, salary, guaranteed payment, bonus, or any payment of any form or kind whatsoever in, to, or from the Shares, Company, its officers, directors, or shareholders except to the extent Secured Party elects to have the Shares returned upon a default of this Agreement.

As payment is made on the Note, the Secured Party hereby authorizes the Pledgor, after every six month period, to record the transfer on its books and records of the pro rata amount of Pledged Shares reflected by and in each payment received during the prior six month period, and Secured Party hereby consents to the release from this Agreement the amount of such Pledged Shares. Pledgor shall send to Secured Party, after each six month period, a statement showing the amount of shares removed from this Pledge Agreement and the number of shares which remain subject to this Pledge Agreement. Secured Party further agrees Pledgor may, in its discretion, cancel the Certificate of Shares No.____, and issue a replacement Certificate which reflects the amount of released shares and the amount of Shares remaining, subject to this Agreement.

     **3.**    **<u>Representations and Warranties of Pledgor</u>.** Subject to the provisions in the Note and Agreement, Pledgor hereby represents and warrants to Secured Party as follows:

     **3.1 Ownership of the Pledged Shares.** Pledgor is and shall be the beneficial and record owner of the Pledged Shares.

     **3.2 Liens, Claims, Encumbrances, Etc.** Pledgor owns the Pledged Shares free and clear of any material liens, claims, encumbrances or security interests of any kind or nature whatsoever.

     **3.3 Authority.** Pledgor is not precluded in any manner whatsoever from executing, and has the requisite authority to execute, this Agreement and to pledge, transfer and grant a security interest and lien in the Collateral as contemplated herein, without the approval or authorization of any other person, including any governmental or regulatory authority whatsoever.

     **3.4 First Priority Lien.** The pledge, assignment, and delivery of the Collateral pursuant to this Agreement will create a valid first priority lien on and a first priority perfected security interest in the Collateral pledged by Pledgor, and the proceeds thereof, securing the payment of the Obligations.

**3.5 Due Authorization.** This Agreement has been duly authorized, executed and delivered by Pledgor and constitutes a legal, valid, and binding obligation of Pledgor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the rights of creditors generally or by the application of general equity principles.

**4.**     **Covenants of Pledgor.** Pledgor hereby covenants and agrees as follows:

**4.1 Sale, Encumbrance, Etc.** Pledgor shall not sell, contract to sell, encumber, hypothecate or permit or suffer any attachment, security interest, lien or other encumbrance or judgment or other judicial or involuntary lien against, or otherwise dispose of, the Collateral or any part thereof, unless Pledgor shall have obtained the prior written consent of Secured Party.

**4.2 Defense of Collateral.** Pledgor shall defend, at Pledgor's sole cost and expense, the Collateral against any and all liens, charges, security interests, and other encumbrances.

**5.**     **Events of Default.** The occurrence of any of the following shall constitute an event of default ("Event of Default") under this Agreement:

**5.1  Default under Note.** Pledgor shall fail to make a payment due under the Note following the applicable cure period.

**5.2  Default on the Obligations.** Pledgor shall default in the performance or observance of any of the Obligations, other than Obligations under the Note, and such default shall not have been cured within thirty (30) days after Pledgor's receipt of written notice thereof from Secured Party.

**5.3  Breach of Representation or Warranty.** Any representation or warranty made by Pledgor herein shall be false in any material respect and such default shall not have been cured within thirty (30) days after Pledgor's receipt of written notice thereof from Secured Party.

**6.**     **Rights of Secured Party Upon Default.** In the event of any Event of Default, Secured Party shall be entitled, without further notice to Pledgor, and without necessity for legal proceedings, to demand immediate return of the Pledged Shares or Secured Party may elect to accelerate all payments due under the Note and to pursue remedies for non payment thereof. Subject thereto, Secured Party shall have any or all

remedies provided by law, including, but not limited to, all rights and powers of a secured party after default pursuant to the Arizona Commercial Code.

**7.    Termination of Agreement.**    Upon payment in full of any and all Obligations, this Agreement and the security interest created hereby in favor of Secured Party shall terminate and Secured Party's rights in the Collateral shall automatically terminate.

**8.    Amendments.**    The provisions of this Agreement may not be waived, altered, amended, or repealed in whole or in part except by the written consent of the parties hereto.

**9.    Counterparts.**    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

**10.    Waiver.**    The failure or delay on the part of any party hereto to exercise any right, remedy, power, or privilege shall not operate as a waiver thereof. Any waiver must be in writing and signed by the party making such waiver. A written waiver of any default shall not operate as a waiver of any other default or of the same type of default on a future occasion.

**11.    Successors and Assigns.**    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, and permitted successors and assigns.

**12.    Necessary Acts.**    Each party hereto shall perform any further acts and execute and deliver any additional agreements, assignments, or documents that may be reasonably necessary to carry out the provisions or to effectuate the purposes of this Agreement.

**13.    Governing Law.**    This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the internal laws of the State of Arizona.

**14.    Attorneys' Fees and Costs.**    If any legal action or other proceeding is brought in connection with this Agreement, the successful or prevailing party, whether or not such party has instituted the action, shall be entitled to recover from the non-prevailing party reasonable attorneys' fees and other costs incurred in such action or proceeding, in addition to any other relief to which it may be entitled.

**15.    Notices.**  All notices and other communications required or which may be given hereunder shall be in writing and shall be deemed effectively given or received for all purposes only (i) when presented personally; (ii) on receipt when mailed by U.S. first class mail, registered or certified, postage prepaid, return receipt requested; (iii) one day after being sent if sent by professional overnight courier or messenger service; or (iv) on the date of transmission if sent by telecopy or other means of electronic transmission, with receipt confirmed by answer back or otherwise, at the address indicated on the signature page to this Agreement (or addressed as any party may subsequently designate by notice in accordance with this Section 15).

**16.    Headings and Captions.**  The headings and captions used herein are solely for the purpose of reference only and are not to be considered in connection with the construction or interpretation of this Agreement.

**17.    Assignment.**  Secured Party may not, without written consent of Pledgor, assign, endorse, or transfer any instrument evidencing all or any part of the Obligations, and upon written consent of Pledgor, the holder of such instrument shall be entitled to the benefits of this Agreement.

**18.    Entire Agreement.**    This Agreement, together with the documents referenced herein, contains all of the agreements of the parties hereto with respect to the matters contained herein and no prior or contemporaneous agreement or understanding, oral or written, pertaining to any such matters shall be effective for any purpose. No provision of this Agreement may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest and expressly stating that it is an amendment of this Agreement.

## [SIGNATURES ON FOLLOWING PAGE]

STOCK PLEDGE AGREEMENT
Page 5 of 6

IN WITNESS WHEREOF, Pledgor and Secured Party have duly executed this Stock Pledge Agreement as of the day and year first above written.

**PLEDGOR:**                    **SECURED PARTY:**

By: _____     By: _____

Its: _____

# ASSIGNMENT OF STOCK AGREEMENT

THIS ASSIGNMENT OF STOCK (this "Agreement") is made and entered as of _____, 2021, between Patricia Ann Schmidt ("Assignor") and Temprite Company, Inc., an Illinois corporation ("Assignee").

WHEREAS, Assignor is the holder of 543.66 shares of stock of Temprite Company, Inc., the Assignee ( the "Shares"); and

WHEREAS, Assignor wishes to convey the Shares to Assignee and Assignee is willing to redeem the Shares from Assignor.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     **Recitals**.   The Recitals are hereby incorporated herein and are acknowledged by the Parties as being true and correct.

2.     **Assignment**.  Assignor hereby assigns, sells, transfers, conveys, and sets over to Assignee, and its successors and assigns, all right, title, and interest of Assignor in and to the Shares, free and clear of all claims, charges, and encumbrances, other than a Stock Pledge Agreement and Promissory Note entered into between the Parties simultaneously with this Assignment for the Shares.

3.     **Warranty**.  Assignor hereby warrants and represents to Assignee that Assignor is the sole legal and beneficial owner of the Shares; Assignor owns the Shares free and clear of all liens, claims, charges, and encumbrances; and Assignor has the full power and authority to assign, sell, transfer, convey, and set over to Assignee, all of Assignor's right, title, and interest in and to the Shares.

4.     **Consideration**.  As consideration for this Assignment, Assignee is paying Assignor $1,000 per share pursuant to a Promissory Note and Stock Pledge Agreement entered into between the Parties simultaneously with this Assignment for the Shares.

5.    **General Provisions**.  This Agreement contains the entire Agreement relating to the assignment and is part of the Parties' Redemption Agreement, Promissory Note, and Stock Pledge Agreement entered into between the Parties simultaneously with this Assignment for the Shares, all of which shall be construed together when interpreting and enforcing this Assignment. This Assignment shall be enforced, interpreted, and governed by the laws of the State of Arizona and any action relating to this Assignment shall be brought in a court of competent jurisdiction in Maricopa County, Arizona. If a court or arbitrator finds that any part in this Assignment is invalid or unenforceable, that specific word, clause, or provision shall be deemed stricken from this Assignment and all other parts of this Assignment shall remain valid and fully enforceable.

By: _____

**PATRICIA ANN SCHMIDT**

**"Assignor"**

**TEMPRITE COMPANY, INC.**

By: _____

Its: _____

**"Assignee"**

ASSIGNMENT OF STOCK AGREEMENT
Page 2 of 2

# EXHIBIT E



**Anne L. Leary**
Shareholder
Direct: (602) 530-8333
Email: anne.leary@gknet.com

February 1, 2022

**VIA CERTIFIED MAIL**

91 7199 9991 7032 3437 4021

Temprite Co.
1555 W. Hawthorne Lane, Ste.1E
West Chicago, IL 60185-1809

  **Re:**   Patricia Schmidt

Dear Sir or Madam:

  I represent Patricia Schmidt, the surviving spouse of George Schmidt, in connection with her demand for benefits under the terms of the Employee Deferred Compensation Agreement, dated July 3, 2003, between Temprite Co. and Mr. Schmidt (the "Agreement"). Enclosed is a copy of the Agreement.

  Under Section of 3 of the Agreement, Mrs. Schmidt is entitled to a Joint and Survivor Annuity payable monthly during her lifetime equal to $4,583.33 per month. Those payments should have commenced on the first day of the calendar month following Mr. Schmidt's date of death, however, no such payments have been made.

  Although Mrs. Schmidt's annuity payments should have commenced on September 1, 2020, no annuity payments have been made to date.

  At this point, Mrs. Schmidt is owed retroactive annuity payments in the amount of $82,499.94. I respectfully request that you (i) issue a check to her for in that amount and (ii) commence making annuity payments to her as specified in the Agreement as of March 1, 2022.

  If you have any questions regarding the foregoing, please do not hesitate to contact me.

    Very truly yours,

    GALLAGHER & KENNEDY, P.A.

    By:

    Anne L. Leary

ALL:cb
Enclosure
cc: Patricia A. Schmidt
8804107v1/40716-0001

**EXHIBIT A**

### EMPLOYEE DEFERRED COMPENSATION AGREEMENT

**THIS EMPLOYEE DEFERRED COMPENSATION AGREEMENT** is made this _3rd_ day of _July_____, 2003, by and between TEMPRITE CO., a _"S"_____ corporation ("Corporation"), and GEORGE SCHMIDT ("Employee").

## R E C I T A L S :

A. Employee is a key employee and officer, and has made a significant contribution to the Corporation's growth and success through long term service to the Corporation; and Employee has provided those services to the Corporation during years in which the Corporation was unable to adequately compensate him.

B. The Corporation desires the Employee to remain in the employ of the Corporation, and to compensate Employee for his service performed in the past by agreeing to make certain payments to Employee upon his retirement or disability, and to his spouse upon his death.

**NOW THEREFORE**, in consideration of the premises and promises contained herein, the parties do hereby agree as follows:

1.    <u>PLAN NOT FUNDED OR QUALIFIED</u>.  This Agreement is intended to be (and shall be construed and administered as) an Employee Pension Benefit Plan under the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is unfunded and is maintained by the Corporation for the purpose of providing deferred compensation for Employee. More specifically, the Agreement is intended as a "top hat" plan under ERISA and is also intended as an unfunded Plan maintained primarily for the purpose of providing deferred compensation for Employee.  The Agreement is not intended to be a qualified plan under Section 401(a) of the Internal Revenue Code of 1986, as amended.

The obligations of the Corporation to make the payments under this Agreement constitutes solely an unsecured (but legally enforceable) promise of the Corporation to make such payments, and no person, including Employee, shall have any lien, prior claim or other security interest in any property of Corporation as a result of this Agreement. No trust, either express or implied, will be established or maintained by Corporation for purposes of funding or paying benefits promised under this Agreement.

2.    <u>EFFECTIVE DATE</u>. The Effective Date (herein so called) of this Agreement for all purposes of Employee's rights to the deferred compensation shall be _7/3/03_____, 2003.

3.    <u>DEFERRED COMPENSATION</u>.

a.    Upon Employee's termination of employment with the Corporation due to (i) retirement from service with the Corporation, (ii) Disability, as defined herein, or (ii) death, Corporation shall pay to Employee, and upon his death, to his spouse, a Joint and Survivor Annuity equal to Four Thousand Five Hundred Eighty Three and 33/100 Dollars ($4,583.33) per month. Said Joint and Survivor Annuity shall commence on the first day of the first calender month following said termination of employment, and shall continue on the

first day of each month thereafter for Employee's lifetime, and upon Employee's death, in the same amount to Employee's spouse for her lifetime.

        b.      For purposes of this Agreement, "Disability" shall mean the Employee (1) has been declared legally incompetent by a final decree (the date of such decree being deemed to be the date on which the disability occurred), (2) receives disability insurance benefits from any disability income insurance policy maintained by the Corporation or by the Employee, or (3) because of medically determinable disease, injury, or other mental or physical disability, is unable to perform substantially all of Employee's regular duties to the Company and that such disability is determined or reasonably expected to last at least twelve (12) months. The determination of disability under (3) above shall be based on the written opinion of the physician regularly attending Employee. If the Corporation disagrees with the opinion of this physician (the "First Physician"), it may engage at its own expense another physician (the "Second Physician") to examine Employee. If the First and Second Physicians agree in writing that Employee is or is not disabled, their written opinion shall be conclusive on the issue of disability. If the First and Second Physicians disagree on the disability of Employee, the Physicians shall choose a third consulting physician (whose expense shall be borne by the Corporation), and the written opinion of a majority of these three physicians shall be conclusive as to Employee's disability. The date of any written opinion conclusively finding Employee to be disabled is the date on which the disability will be deemed to have occurred. In conjunction with a disability determination, Employee hereby consents to any required medical examination, and agrees to furnish any medical information requested by any examining physician and to waive any applicable physician-patient privilege that may arise because of such examination. All physicians except the First Physician must be board-certified in the specialty most closely related to the nature of the disability alleged to exist.

        4.      <u>NON ASSIGNMENT.</u>  Employee hereby agrees that Employee shall have no rights to sell, assign, transfer, mortgage, alienate, pledge, hypothecate or in any way encumber or dispose, of Employee's right to receive the deferred compensation hereunder, nor shall any interest in amounts payable hereunder or in any payments, be subject to seizure for payment of any debts, judgments, alimony or separate maintenance, or be reached or transferred by operation of law in the event of bankruptcy, insolvency or otherwise, and any attempt to transfer an interest in the deferred compensation or other payment due hereunder in violation of this Agreement shall be ineffective, and shall thereby grant to the Corporation the option to terminate this Agreement without any further obligation thereunder to Employee or its successor or assigns.

        5.      <u>REMEDIES.</u>  The parties hereto understand and agree that irreparable injury would be caused to Employee and his spouse and to the Corporation by failure of a party to comply with the terms of this Agreement; that in the event of any actual or threatened default in or breach of any of the provisions in this Agreement, the party or parties who are aggrieved thereby shall have the right to specific performance and/or an injunction, as well as monetary damages and any other appropriate relief in law or in equity which may be granted by any court in the United States of America; and that all such rights and remedies shall be cumulative.

        6.      <u>NON INTERFERENCE WITH OTHER PLANS OR BENEFITS.</u> Nothing in this Agreement shall in any way affect or interfere with Employee's rights or privileges under any other retirement, pension, profit sharing, bonus, insurance, hospitalization, or other employee

-2-

·benefit plan, now in effect or hereafter adopted, in which Employee is entitled to share or participate as an employee of the Corporation.

      7.    WAIVER.  A party's failure to insist on compliance or enforcement of any provisions of this Agreement, shall not affect the validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement by that party or any other party.

      8.    FURTHER ACTION.  The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes of the Agreement.

      9.    PARTIES IN INTEREST. Nothing herein shall be construed to be to the benefit of any third party, nor is it intended that any provision shall be for the benefit of any third party; provided, however, in the event that Employee's spouse is entitled to receive the benefits hereunder following Employee's death, such spouse shall be entitled to enforce her rights and remedies hereunder as if she was an original party hereto.

      10.    SAVINGS CLAUSE.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of the Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

      11.    ENTIRE AGREEMENT.  The parties hereto expressly acknowledge that this Agreement constitutes the entire contract between the parties concerning the subject matter hereof, and that unless otherwise provided in this Agreement, any other agreements or understandings, oral or written, of any nature with respect to such matters are hereby superseded and revoked.

      12.    NOTICES.  Any and all offers, acceptances, consents, waivers and other notices required by this Agreement shall be deemed to be sent or delivered when personally delivered to the recipient or when mailed by certified or registered mail with proper first class postage attached thereto, to the parties hereto;

If to Corporation:    TEMPRITE CO.
                     *1555 HAWTHORNE LN,*
                     *WEST CHICAGO IL 60185*

If to Employee:    GEORGE SCHMIDT
                  11869 N. 114th Way
                  Scottsdale, AZ  85259

Any notice required to be made within a stated period of time shall be considered timely mailed if deposited before midnight of the first day of the stated period.

      13.    TERMINATION.  This Agreement shall terminate upon the occurrence of any one of the following events:

a. The written agreement of the parties and, if Employee is married, Employee's spouse, to that effect;

b. The bankruptcy, receivership or dissolution of the Corporation; or

c. The termination of the Employee's employment with the Corporation and the payment of all of the deferred compensation, if any, due to Employee and his spouse hereunder.

D. THE SUBSEQUENT MARRIAGE OF THE DECEASED EMPLOYEE'S SPOUSE 9/13/03

14.   AMENDMENT.  This Agreement may be altered or amended in whole or in part at any time by filing with this Agreement a written instrument setting forth such changes, duly signed by the Corporation and the Employee.

15.   BINDING AGREEMENT.  This Agreement shall be binding not only upon the parties hereto, but also upon their heirs, executors, administrators, successors or assigns; and the parties hereby agree for themselves and their heirs, executors, administrators, successors or assigns, to execute any instruments and to perform any acts which may be necessary or proper to carry out the purposes of this Agreement.  In that regard, Corporation expressly agrees that it shall not merge or consolidate into or with another company or sell substantially all of its assets to another company, firm or person until such company, firm or person expressly agrees, in writing, to assume and discharge the duties and obligations of the Corporation under this Agreement.

16.   GENDER.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and other gender, masculine, feminine or neuter, as the context requires.

17.   STATE LAW.  This Agreement shall be governed by the laws of the State of Arizona.

18.   NAMED FIDUCIARY AND PLAN ADMINISTRATOR.  The "Named Fiduciary and Plan Administrator" of this plan shall be _Bob Brown_ until his resignation or removal by the Board of Directors.  As Named Fiduciary and Plan Administrator, _Bob Brown_ shall be responsible for the management, control and administration of this Agreement as established herein.  He may delegate to others certain aspects of the management and operation responsibilities of the plan including the employment of advisors and the delegation of ministerial duties to qualified individuals.

19.   CLAIMS PROCEDURE AND ARBITRATION.  In the event a dispute arises over benefits under this Plan Agreement and benefits are not paid to the Employee (or to his spouse in the case of the Employee's death) and such claimant feels he or she is entitled to receive such benefits, then a written claim must be made to the Named Fiduciary and Plan Administrator named above within sixty (60) days from the date payments are refused.  The Named Fiduciary and Plan Administrator and the Corporation shall review the written claim and if the claim is denied, in whole or in part, they shall provide in writing within ninety (90) days of receipt of such claim their specific reasons for such denial, reference to the provisions of this Agreement upon which the denial is based and any additional material or information is necessary to perfect the claim.  Such written notice shall further indicate the additional steps to be taken by claimants if a further review of the claim denial is desired.  A claim shall

-4-

be deemed denied if the Named Fiduciary and Plan Administrator fails to take any action within the aforesaid ninety-day period.

If claimant desires a second review, he or she shall notify the Named Fiduciary and Plan Administrator in writing within sixty (60) days of the first claim denial. Claimant may review the Agreement or any documents relating thereto and submit any written issues and comments he or she may feel appropriate. In his sole discretion, the Named Fiduciary and Plan Administrator shall then review the second claim and provide a written decision within sixty (60) days of receipt of such claim. This decision shall likewise state the specific reasons for the decision and shall include reference to specific provisions of the Agreement upon which the decision is based.

If claimant continues to dispute the benefit denial based upon completed performance of the Agreement or the meaning and effect of the terms and conditions thereof, then claimant may submit the dispute to a Board of Arbitration for final arbitration. Said Board shall consist of one member selected by the claimant, one member selected by the Corporation and the third member selected by the first two members. The Board shall operate under any generally recognized set of arbitration rules. The parties hereto agree that they and their heirs, personal representatives, successors and assigns shall be bound by the decision of such Board with respect to any controversy properly submitted to it for determination.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement the day and year first above written.

CORPORATION:

TEMPRITE CO., an
_____"S"_____ corporation

By: _____
Its: _____PRESIDENT_____

EMPLOYEE:

_____
GEORGE SCHMIDT

# EXHIBIT F



**Anne L. Leary**
Shareholder
Direct: (602) 530-8333
Email: anne.leary@gknet.com

91 7199 9991 7032 3437 4007

May 23, 2022

**VIA CERTIFIED MAIL**

Mr. Bob Brown
Temprite Co.
1555 W. Hawthorne Lane, Ste.1E
West Chicago, IL 60185-1809

       **Re:**   **Patricia Schmidt**

Dear Mr. Brown:

      As you know, Temprite Co. and George Schmidt entered into an Employee Deferred Compensation Agreement, dated July 3, 2003 (the "Agreement"). You are designated as the Plan Administrator in the Agreement. Under the terms of the Agreement, Patricia Schmidt, as Mr. Schmidt's surviving spouse, is entitled to a benefit in the amount of $4,583.33 per month following his death. Although Mr. Schmidt died on August 9, 2020, and Mrs. Schmidt's monthly benefits should have commenced on September 1, 2020. To date, she has not received any payments.

      In accordance with the terms of the Agreement's claim procedure, she filed a claim for benefits on September 9, 2021, to which she did not receive a written response from you within the period specified in the claim's procedure. Treating your failure to respond as a deemed denial of her claim, she filed a request for review on February 1, 2022. Again, she did not receive a written response within the time period specified in the Agreement's claims procedure.

      Although the Agreement specifies that arbitration is the next step where a request for review has been denied, it is clear that proceeding to arbitration would be futile in light of your prior deliberate disregard of the Agreement's claims procedures. Accordingly, please be advised that Mrs. Schmidt will be filing a lawsuit against you and Temprite seeking the benefits to which she is entitled under the Agreement. She will also be seeking interest on amounts to which she became entitled beginning on September 1, 2020, which remain unpaid.

      If you have any questions regarding the foregoing, please do not hesitate to contact me.

          Very truly yours,

          GALLAGHER & KENNEDY, P.A.

          By:

          Anne L. Leary

ALL:cb

9138910v1/40716-0001

2575 East Camelback Road  |  Phoenix, Arizona 85016-9225  |  P: 602-530-8000  |  F: 602-530-8500  |  www.gknet.com

# USPS Tracking®

**FAQs ⟩**

## Track Another Package **+**

**Tracking Number:** 9171999991703234374007

Remove ✕

Your item was delivered to an individual at the address at 12:35 pm on May 27, 2022 in WEST CHICAGO, IL 60185.

**USPS Tracking Plus® Available** ⌄

⊘ **Delivered, Left with Individual**

May 27, 2022 at 12:35 pm
WEST CHICAGO, IL 60185

Feedback

**Get Updates** ⌄

---

**Text & Email Updates** ⌄

---

**Tracking History** ⌃

**May 27, 2022, 12:35 pm**
Delivered, Left with Individual
WEST CHICAGO, IL 60185
Your item was delivered to an individual at the address at 12:35 pm on May 27, 2022 in WEST CHICAGO, IL 60185.

**May 27, 2022, 6:32 am**
Out for Delivery
WEST CHICAGO, IL 60185

---

**May 27, 2022, 6:21 am**
Arrived at Post Office
WEST CHICAGO, IL 60185

---

**May 26, 2022, 7:32 pm**
Arrived at USPS Regional Facility
CAROL STREAM IL DISTRIBUTION CENTER

---

**May 25, 2022**
In Transit to Next Facility

---

**May 23, 2022, 10:47 pm**
Departed USPS Regional Facility
PHOENIX AZ DISTRIBUTION CENTER

---

**May 23, 2022, 9:39 pm**
Arrived at USPS Regional Facility
PHOENIX AZ DISTRIBUTION CENTER

Feedback

---

**USPS Tracking Plus®**                                              ⌄

---

**Product Information**                                              ⌄

---

See Less ⌃

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**