**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Schmidt, | No. CV-22-01464-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Employee Deferred Compensation Agreement dated July 3, 2003, et al., | |
| Defendants. | |

Plaintiff Patricia Schmidt believes she is entitled to monthly payments of approximately $4,600 pursuant to a deferred compensation agreement between her late husband and his former employer, Defendant Temprite Company. Patricia filed this suit against Temprite and others, seeking to recover the monthly payments. One defendant seeks dismissal for lack of personal jurisdiction. Given the standard for personal jurisdiction that applies in suits of this type, that motion will be denied. Other defendants seek dismissal based on Patricia's alleged failure to exhaust administrative remedies before filing suit. Because Temprite did not establish and follow a reasonable claims procedure, Patricia was not required to exhaust her administrative remedies. Thus, the second motion to dismiss will be denied as well.

## BACKGROUND

Plaintiff Patricia Schmidt and George Schmidt were married sometime in the 1990s. Both before and during that marriage George worked for Temprite Company, an Illinois corporation in the refrigeration industry. (Doc. 1 at 3). As of the early 2000s, George was

working as a high-level executive at Temprite. (Doc. 1 at 2). On July 3, 2003, George and Temprite entered into an "Employee Deferred Compensation Agreement." (Doc. 1 at 12). That agreement states it is intended to be "an Employee Pension Benefit Plan under the provisions of the Employee Retirement Income Security Act of 1974, as amended ('ERISA')." (Doc. 1 at 12). The agreement also states it is "intended as a 'top hat' plan under ERISA." The term "top hat plan" refers to a special type of benefit plan recognized under ERISA that provides "deferred compensation for a select group of management or highly compensated employees." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1193 (9th Cir. 2007) (quoting 29 U.S.C. § 1051(2)).

Under the terms of the top hat plan, if George stopped working for Temprite due to retirement, disability, or death, Temprite would pay him, "and upon his death" his spouse, a monthly benefit of $4,583.33 (*i.e.*, $55,000 per year). (Doc. 1 at 12). If George died before his spouse, the monthly benefit payments would continue until his spouse's death. Monthly payments would commence automatically "on the first day of the first calendar month" after George no longer worked at Temprite.

The top hat plan has a section titled "Named Fiduciary and Plan Administrator." In that section, the name "Bob Brown" is handwritten into the typed agreement as the plan administrator. The section explains Brown will be "responsible for the management, control and administration" of the plan. (Doc. 1 at 15). The top hat plan also has a lengthy section regarding "claims procedure and arbitration." In brief, that section requires George or his spouse send the plan administrator "a written claim" within sixty days of a payment not being made. The plan administrator is then required to respond in writing within 90 days setting out "specific reasons for such denial," including "reference to the provisions" of the top hat plan that justify the failure to make a payment. If George or his spouse wish for further review, a second written request must be submitted within sixty days of the first claim denial. The plan administrator is required to provide a second decision within sixty days. Finally, if the claim is denied a second time, George or his spouse may "submit the dispute to a Board of Arbitration for final arbitration." The plan states the parties will "be

1  bound by the decision" of the arbitrator. (Doc. 1 at 16). The top hat plan was signed by
2  George and Tom Schmidt, the President of Temprite at that time.

3        Approximately three weeks after the top hat plan was signed, Bob Brown sent a
4  letter to the United States Department of Labor. (Doc. 1 at 18). That letter, sent to comply
5  with regulations regarding top hat plans, stated Temprite had entered into a top hat plan
6  with one employee. The parties agree the letter was referencing the top hat plan with
7  George.

8        At some unidentified time after the top hat plan was in place, George "explained to
9  Patricia . . . that she would receive monthly payments from Temprite upon his death."
10 (Doc. 1 at 5). George did not give Patricia details, nor did he provide her with a copy of
11 the plan. On August 9, 2020, George died. At that time, George was still a Temprite
12 employee. Based on what George had told her, Patricia believed Temprite should have
13 immediately started sending her monthly payments. When Temprite failed to do so,
14 Patricia "contacted Temprite to inquire about the status of benefits George had previously
15 described to her" but she was repeatedly told no plan existed and no benefits were due.
16 (Doc. 1 at 5). Patricia alleges she was told this information by Temprite's current president
17 as well as Brown, who still works for Temprite in the role of "Secretary and Treasurer."

18       Despite Temprite's statements, Patricia continued to believe benefits were due.
19 Around this same time, Patricia and Temprite were in negotiations regarding the
20 disposition of Temprite stock owned by Patricia. Patricia and Temprite apparently reached
21 an agreement where she would be paid one million dollars for her Temprite stock. (Doc.
22 1 at 33). In August 2021, Patricia located a copy of the top hat plan. A few weeks later,
23 on September 9, 2021, Patricia sent an eleven-page letter to Brown regarding the top hat
24 plan. The parties have very different interpretations of that letter.

25       Patricia's September 9th letter was titled "Demand for Benefits Pursuant to the
26 Employee Deferred Compensation Agreement Between Temprite and George Schmidt."
27 The letter begins by explaining Patricia was "demand[ing]" payments under the top hat
28 plan. (Doc. 1 at 20). The remainder of the letter explains that Temprite had concealed the

existence of the top hat plan, what was required under the terms of the plan, and how Temprite had not complied with the terms of the plan. The letter also included two statements that have led to confusion. On the second page of the letter Patricia stated "I want to make clear that I am not attempting to submit a claim for my benefits under the unreasonable, illegal, and wholly futile administrative claims process outlined in the Plan." (Doc. 1 at 21). And at the end of the letter Patricia stated "pursuing a resolution through Temprite's administrative scheme would be a futile effort." (Doc. 19 at 32). The parties now disagree about what those statements were intended to convey.

According to Patricia, those statements meant to convey she was demanding payment of the benefits under the top hat plan, but she was not recognizing the validity of the claims procedures set forth in the top hat plan. As for Brown and Temprite, they claim they interpreted Patricia's sentence as an unequivocal refusal to invoke the administrative claims process. This interpretation, however, is difficult to reconcile with Temprite's actions after receiving the letter.

Less than a week after receiving the letter, Temprite's counsel sent an email to counsel representing Patricia in the probate of George's estate. (Doc. 19 at 21). That email explained the current president of Temprite believed the top hat plan had been eliminated "back around 2010 and any alleged rights of Pat under [the top hat plan were] not in existence." (Doc. 19 at 21). Thus, Temprite's counsel interpreted Patricia's September 9th letter as an attempt to recover benefits she believed were due under the top hat plan. The present record does not contain the response, if any, Patricia made to this email.

On September 30, 2021, Temprite's counsel sent a letter to the same probate counsel who had received the email a few weeks earlier. That letter addressed both the top hat plan benefits as well as the negotiations regarding Patricia's sale of her Temprite stock. That letter stated Patricia's demands regarding the top hat plan were "rejected" but she was "free to sue in Federal Northern District Court in Illinois to enforce what she thinks is a binding Deferred Compensation Agreement." The letter also stated the following:

> Additionally, please remind Pat the Deferred Compensation Agreement was shelved in lieu of her receiving 1,000 shares of

- 4 -

> stock in Temprite. Does Pat wish to return her million dollars she was paid for this stock and enforce the Deferred Compensation Agreement instead? Does Pat think she gets both?

(Doc. 1 at 34). The parties have not provided the response, if any, Patricia sent to Temprite.

On February 1, 2022, Patricia sent another demand for benefits under the top hat plan. (Doc. 1 at 59). That letter, however, was sent to "Temprite Co." instead of Brown and it did not reference the September 9, 2021, letter. Temprite did not respond. On May 23, 2022, Patricia sent another written demand for benefits, this time to Brown. (Doc. 1 at 66). That demand argued the September 9, 2021, letter was an initial claim for benefits and the February 1, 2022, letter was "a request for review" of the denial of benefits. The letter then noted the top hat plan contemplated arbitration as the next step but that allegedly would be futile given Brown's "prior deliberate disregard of the [top hat plan's] claims procedures." (Doc. 1 at 66). Brown did not respond.

On August 30, 2022, Patricia filed the present suit against Brown, Temprite, and the top hat plan. (Doc. 1). Patricia's complaint asserts a single claim for benefits pursuant to ERISA.[1] Brown responded to the complaint with a motion to dismiss, arguing the Court lacks personal jurisdiction over him. That motion also contains a request to transfer this case to the Northern District of Illinois. Brown, Temprite, and the top hat plan ("Defendants") filed a separate motion to dismiss, arguing Patricia had not exhausted her administrative remedies before filing suit.

## ANALYSIS

The parties' actions leading up to this suit make very little sense from a neutral perspective. Patricia believed she was entitled to benefits under the top hat plan, but she sent a letter seeking those benefits that was most naturally read as refusing to submit an administrative claim under the terms of the top hat plan. As for Temprite and Brown, they

---

[1] Brown is sued only in his capacity as plan administrator. Top hat plans are not subject to ERISA's fiduciary requirements. Thus, unlike most cases involving ERISA plans, Brown cannot be sued for breaching any fiduciary duty in his administration of the plan. *See Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996) (stating a top hat plan administrator "cannot be held personally liable" for breach of fiduciary duty).

- 5 -

insinuate Patricia fabricated the top hat plan and they plan to "object" to admission of a copy of the plan. (Doc. 19 at 2). But in September 2021, Temprite's counsel admitted the top hat plan had previously existed and had been "shelved in lieu of [Patricia] receiving" shares of Temprite stock. (Doc. 1 at 34). Paradoxically, despite claiming the top hat plan does not exist, Temprite and Brown also argue Patricia was required to comply with the claims procedures in the plan document. Temprite and Brown do not explain why they are demanding Patricia comply with the terms of a plan they do not believe exists. Regardless of the parties' perplexing pre-litigation behavior, resolution of the issues presented by the pending motions is straightforward.

### I.  Personal Jurisdiction Over Bob Brown

Brown claims the Court lacks personal jurisdiction over him because he has no contacts with Arizona. Patricia responds that ERISA authorizes nationwide service of process which means personal jurisdiction over a defendant will exist in any district, provided the defendant has sufficient contacts with the United States. *See, e.g.*, *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).[2] Because Brown undoubtedly has sufficient contacts with the United States, Patricia believes the personal jurisdiction inquiry is over.

In his reply, Brown agrees ERISA allows for "nationwide personal jurisdiction" as described by Patricia. (Doc. 25 at 2). Brown also admits that if he had "signed" the top hat plan, or if he had acted as plan administrator, the Court would have personal jurisdiction over him. But Brown states he did not sign the top hat plan or act as the plan administrator. Therefore, Brown believes ERISA's approach to personal jurisdiction does not apply.

---

[2] The Ninth Circuit's decision in *Cripps* does not wade into this issue in detail. There appears to be a circuit split on how the personal jurisdiction analysis should proceed under ERISA's nationwide service of process provision. In the Sixth and Seventh circuits, proper service of process means personal jurisdiction exists and no additional inquiry regarding due process is required. *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 567 (6th Cir. 2001); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1036 (7th Cir. 2000). In the Tenth Circuit, however, a court must determine if service of process was proper and, if so, the court must then analyze whether the exercise of jurisdiction comports with due process based on contacts with the particular forum state. *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000). Brown does not present any argument that service of process is only the first step in the analysis. Therefore, the Court need not delve into this issue.

For purposes of resolving Brown's challenge to personal jurisdiction, the Court must accept the uncontroverted allegations in the complaint and the "evidentiary materials" submitted by the parties must be "construed in the light most favorable to the plaintiff[]." *Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002). The complaint alleges Brown is identified in the plan document as the plan administrator and that Brown remains the plan administrator. These allegations are only partially controverted. Brown agrees he is named in the plan document, but he claims he "never agreed to serve" as the plan administrator, and he is not presently serving as a plan administrator "for any plan." (Doc. 18 at 13).

The parties have not cited any authority addressing how to approach a challenge to personal jurisdiction by an individual identified as the plan administrator in an ERISA plan who avers he never agreed to serve as the plan administrator and further states he is not now serving as the plan administrator. *Cf. Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 277 (4th Cir. 2019) (noting "plan administrators and named fiduciaries do not normally disclaim their fiduciary roles and responsibilities in the federal courts"). In some situations, it would be difficult to conclude an individual must participate in litigation across the country merely because someone unilaterally and without his knowledge identified him as the plan administrator in a plan document. Fortunately, the Court need not address that scenario because the unique circumstances of the present case establish Brown should remain as a defendant, subject to later dismissal if discovery establishes he is not the plan administrator.

At this stage, Patricia's burden for establishing personal jurisdiction is relatively low. Patricia and Brown agree the plan document identifies Brown as the plan administrator and that alone goes a long way towards meeting Patricia's burden. Further, while Brown's affidavit states he never agreed to act as plan administrator, Patricia has no way of challenging that statement absent discovery. And even beyond his identification in the plan document, Brown sent a letter to Department of Labor indicating his knowledge of the plan. Brown disclaims knowledge of that letter but there is no indication the letter

is fabricated. Again, Patricia would need discovery to counter Brown's position. Thus, based on the evidence available to Patricia, she has made as strong as possible showing that Brown is the plan administrator subject to ERISA's nationwide service of process statute.

Despite being named in the plan document, Brown argues he cannot be deemed the plan administrator because the plan document does not contain his signature. Brown has not provided any authority establishing a plan administrator must sign a plan document to have duties under the plan. Thus, the absence of Brown's signature is immaterial. Brown also argues he cannot be deemed the plan administrator because he has not performed the work of plan administrator. But that argument does not prove what Brown thinks it does. Construed in the light most favorable to Patricia, Brown's statement that he has not acted as the plan administrator is evidence he has not performed tasks he should have performed.

At this very preliminary stage, Brown is identified as the plan administrator in the plan document and the Court will accept that identification as valid. ERISA's provision authorizing nationwide service of process applies and this Court has personal jurisdiction over Brown.[3]

## II.     Transfer is Not Appropriate

At the end of Brown's motion to dismiss, Brown and the other defendants seek transfer to the Northern District of Illinois. This argument is not developed in any meaningful way. More importantly, the portion of the motion seeking transfer acknowledges transfer would not be appropriate if the Court concludes it has personal jurisdiction over Brown. The motion states: "should this Court rule it does have jurisdiction over Robert Brown . . . no objection to maintaining the action in Arizona is made." (Doc. 18 at 8). Because there is personal jurisdiction over Brown, the request to transfer will be denied.[4]

---

[3] Despite this conclusion, the parties should confer on whether Brown can be dismissed as unnecessary. Should Patricia prevail, all benefits will be paid from Temprite's assets. Therefore, at present, Brown does not appear to be a necessary defendant for Patricia to obtain complete relief.

[4] In the reply, Brown and the other defendants appear to change positions and argue transfer should be granted regardless of Brown's presence in the suit. (Doc. 25 at 3). The reply

**III.     Patricia Sufficiently Exhausted Her Administrative Remedies**

Defendants argue they are entitled to dismissal because Patricia did not exhaust her administrative remedies prior to filing suit. This argument is difficult reconcile with Defendants' primary position that the top hat plan does not exist. If Defendants are correct and the plan does not exist, then Patricia's alleged failure to exhaust administrative remedies is irrelevant. Although unstated, presumably Defendants' administrative exhaustion argument asks the Court to assume temporarily that the top hat plan exists such that Patricia was required to follow the claims process contained in the plan. The problem with this argument is that, assuming the top hat plan exists, Defendants did not establish and follow reasonable claims procedures. Therefore, Patricia was not required to pursue the claims process before filing suit.

"Top hat plans are exempt from many of ERISA's substantive requirements." *Sznewajs v. U.S. Bancorp Amended & Restated Supplemental Benefits Plan*, 572 F.3d 727, 734 (9th Cir. 2009). Such plans are not exempt, however, from the requirement that they establish and follow reasonable procedures regarding the handling of claims for benefits. *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 217 (2d Cir. 2006). As with other ERISA plans, when a top hat plan "fails to establish or follow reasonable claims procedures consistent with the requirements of ERISA, a claimant need not exhaust because his claims will be deemed exhausted." *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1088–89 (9th Cir. 2012). *See also* 29 U.S.C. § 1133 (discussing "claims procedure" every plan, including top hat plans, must follow).

The undisputed facts establish there were not reasonable claims procedures in place for Patricia to invoke. Assuming the top hat plan existed, it required a written claim for

---

argues "every material witness to the formation, existence or non-existence, and cancellation" of the top hat plan "is located in Illinois except Tom Schmidt." (Doc. 25 at 3). Tom Schmidt, the only other signatory to the top hat plan, is in Arizona. Therefore, even on the merits, transfer to Illinois under 28 U.S.C. § 1404(a) would not be appropriate. Patricia is located in Arizona and the benefits, if due, will be paid in Arizona. The most important witness to the existence of the agreement is Tom Schmidt, who also is in Arizona. And while Brown and Temprite are in Illinois, there is no indication that litigating in Arizona would be burdensome to them. The convenience of the parties and witnesses support this case staying in Arizona.

benefits be made to "the Named Fiduciary and Plan Administrator." (Doc. 1 at 63). That meant Patricia was required to submit an initial claim to Brown. According to his affidavit, however, Brown never agreed to be the plan administrator and has never acted as the plan administrator. Given those statements, there were not reasonable claims procedures for Patricia to pursue. In simple terms, it would not have been reasonable to require Patricia send an administrative claim to Brown, an individual who disavows any role in the administration of the top hat plan.

Even assuming Patricia was required to pursue the claims procedures in the top hat plan, she made an initial attempt to do so. Patricia's September 9, 2021, letter to Brown was a written demand for benefits. (Doc. 1 at 20). That letter contained the statements that Patricia was not invoking the administrative claims process and she perceived making a formal administrative claim as futile. (Doc. 1 at 21). But a few stray statements in an eleven-page letter demanding payment should not have led Brown to conclude no claim was being made. If Brown was truly uncertain about the intent of the letter, he should have sought clarification. For example, he could have asked Patricia to clarify if she was, in fact, refusing to comply with the plan's claims procedures. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (claims regulation "calls for . . . a meaningful dialogue between ERISA plan administrators and their beneficiaries"). At any rate, it appears Brown construed the letter as a request for benefits under the top hat plan. Construed as a claim, Brown and Temprite then did not comply with the regulations regarding what administrative claim denials must contain.

After Brown received Patricia's September 9th letter, Brown had his counsel send a letter to Patricia's counsel stating the top hat plan did not exist and Patricia could file a lawsuit if she believed otherwise. (Doc. 1 at 34). Brown now describes that letter as a denial of Patricia's "claim for benefits." (Doc. 19 at 9). If Brown meant that letter to be a formal denial, it was required to include additional information. By regulation, a denial of a claim for benefits must contain all of the following:

> (i) The specific reason or reasons for the adverse determination;

    (ii) Reference to the specific plan provisions on which the determination is based;

    (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]

    (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. § 2560.503-1(g).  The claim denial sent to Patricia may have satisfied the first two of these requirements but the third and fourth requirements were not met.  Brown's failure to include the required information is additional evidence there were not reasonable claims procedures in place.  The lack of reasonable claims procedures means any alleged failure by Patricia to exhaust administrative remedies is irrelevant.

  Accordingly,

  **IT IS ORDERED** the Motions to Dismiss and Motion to Transfer (Doc. 18, 19) are **DENIED**.

  Dated this 3rd day of January, 2023.

                 Honorable Roslyn O. Silver
                 Senior United States District Judge