**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Schmidt,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Employee Deferred Compensation Agreement dated July 3, 2003, et al.,<br><br>　　　　　Defendants. | No. CV-22-01464-PHX-ROS<br><br>**ORDER** |

Plaintiff Patricia Schmidt believes she is entitled to monthly benefits under a pension plan allegedly established for her deceased spouse by his former employer, Defendant Temprite Co. Patricia seeks summary judgment that she is entitled to benefits while Temprite seeks summary judgment that Patricia is not. Viewing the record in the light most favorable to Temprite, Patricia is entitled to benefits.

## BACKGROUND

Cross-motions for summary judgment usually require the Court "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *Am. C.L. Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). Here, the Court will begin by evaluating Patricia's motion, viewing the facts in the light most favorable to Temprite. Viewing the facts in that light establishes there is no genuine dispute of material fact and Patricia is entitled to summary judgment. Therefore, the Court need not resolve Temprite's motion under a different view of the facts.

Sometime prior to 1990, George Schmidt and his son, Tom Schmidt, co-founded

Temprite, an Illinois Corporation. (Doc. 59-2 at 93). George and Patricia met in 1992 and married in 1994.[1] (Doc. 59-1 at 82-3; 59-2 at 93). As of 2003, George and Tom were working for Temprite and were Temprite's only shareholders. (Doc. 59-2 at 93). In July 2003, George began exploring ways to provide for Patricia should he die before her. (Doc. 59-2 at 93). George and Tom discussed the issue and eventually George presented Tom with a document titled "Employee Deferred Compensation Agreement." (Doc. 59-2 at 94). The agreement stated it was "intended as a 'top hat' plan under ERISA" and the Court will refer to that agreement as the "top hat plan" or simply "the plan."[2] (Doc. 57-1 at 2).

The top hat plan stated Temprite "desire[d] [George] to remain in the employ of [Temprite] and to compensate [George] for his service performed in the past." (Doc. 57-1 at 2). The top hat plan promised payments to George of approximately $4,600 per month upon his termination of employment or disability. Upon George's death, the monthly payments would be paid to Patricia for the remainder of her life. (Doc. 57-1 at 3). The top hat plan identified another Temprite employee, Bob Brown ("Brown"), as its named fiduciary and plan administrator. On or about July 3, 2003, George signed the top hat plan. Tom, acting in his capacity as President of Temprite, signed the plan the same date. (Doc. 57-1 at 6).

While admitting he signed the top hat plan, Tom states George never asked Temprite's Board of Directors to approve it. (Doc. 59-2 at 94). At the time George and Tom signed the top hat plan, Temprite had three directors: George, Tom, and Brown. During discovery in this case, Temprite produced a document titled "Adopting of Resolutions by Consent of the Directors of Temprite Co. in Lieu of Special Meeting." (Doc. 64-2 at 3). That document, dated the same day as the top hat plan, authorizes

---

[1] Three of the individuals involved in this case share the last name of Schmidt. Therefore, the Court will use first names throughout this Order.

[2] The term "top hat plan" refers to a special type of ERISA plan that provides "deferred compensation for a select group of management or highly compensated employees." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1193 (9th Cir. 2007) (quoting 29 U.S.C. § 1051(2)). The parties agree George's position and compensation with Temprite were sufficient to authorize a top hat plan benefitting George. *Cf. Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (noting plan must cover select group to qualify as "top hat plan").

Temprite to "enter into" the top hat plan. The document was signed by George and Tom but there is no signature from Brown.

While Brown did not sign the top hat plan or the resolution authorizing it, he was aware the plan had been executed. Approximately three weeks after the top hat plan was executed, Brown sent a letter to the Department of Labor stating the plan was in effect. The letter was intended to comply with a reporting obligation applicable to top hat plans. 29 C.F.R. § 2520.104-23. According to the letter, Temprite had entered into "an agreement with a shareholder, and such agreement is determined to be a 'plan' under ERISA." The letter also stated "[o]nly one employee participates in this plan." (Doc. 57-1 at 8). Brown signed the letter and sent a copy to George. Everyone agrees the letter was referencing George's top hat plan.

According to Tom, after 2003 the top hat plan "was simply forgotten." (Doc. 59-2 at 94). It was not until 2010 that Tom thought about the top hat plan again. Tom's retelling of the events of that year includes statements allegedly made by George that Tom relies on for their truth. As discussed in more detail later, George's statements recounted by Tom are inadmissible hearsay and Temprite has not established how they would be admissible at trial. *Cf. Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (noting court may consider hearsay at summary judgment if it could be presented in admissible form at trial). While not admissible, the Court will recount George's alleged statements in this background section to provide sufficient context to understand the parties' positions.

In 2010, Tom and George began discussions with an accountant and attorneys how to arrange for payments to Patricia after George's death. Based on those discussions, Tom concluded George was attempting to "resurrect the idea" of payments to Patricia after his death as set forth in the top hat plan, just with a higher annual payment. During the discussions Tom objected to Patricia receiving any shares of Temprite. Tom claims he discussed this issue repeatedly with George. Tom admits the top hat plan was not mentioned during these discussions, but he believes there was somehow an "implicit" understanding at that time that the top hat plan was not in effect. Tom does not cite any

clearly reliable reason for this other than the fact that no one mentioned the top hat plan. George and Tom were unable to reach an agreement and George decided to take unilateral action.

On June 14, 2010, Tom received a letter from Temprite's secretary stating George had given Patricia 1,000 shares of Temprite stock. Tom was "very upset about this letter" and he argued with George about the share transfer. Contrary to his statement that there was an "implicit" understanding the top hat plan was no longer in effect, Tom claims the letter prompted him to "raise[] with [George] the 2003 Top Hat Plan and ask[] if that was still [in] place." (Doc. 59-2 at 98). Tom informed George that he would "never agree" to Patricia owning shares of stock and receiving payments under the top hat plan. According to Tom, George allegedly said "he had forgotten about the 2003 Top Hat Plan but thought we had a verbal understanding only, and agreed that the 2003 Top Hat Plan would go away and be replaced by the agreement to transfer [shares] to Patricia." (Doc. 59-2 at 98).

An agreement regarding Patricia's ownership of stock between George and Tom was eventually reached and, in August 2010, George, Patricia, and Tom executed a "Share Purchase and Redemption Agreement." That agreement stated each signatory owned shares in Temprite. (Doc. 59-2 at 81). As relevant here, the agreement provided that upon George's death, Patricia would be required to sell her shares to Temprite. (Doc. 59-2 at 85). The agreement contained an integration clause that will be discussed in more detail later. (Doc. 59-2 at 88). Despite his insistence that he would "never agree" to allowing Patricia to own stock and be entitled to payments under the top hat plan, the 2010 agreement does not mention the top hat plan. Tom states he "understood" the top hat plan was "being replaced by the new stock purchase agreement." (Doc. 59-2 at 99).

The crucial facts up to 2010, viewed in the light most favorable to Temprite, can be summarized as follows. Tom knew of the top hat plan in 2003 and admits he signed it. The top hat plan was authorized by two of Temprite's directors and the other director did not object to the plan once he learned of it. After 2003, the top hat plan was not discussed again until 2010. That year Tom asked George whether the top hat plan was still in effect

and George made a confusing statement about the top hat plan potentially being only a verbal agreement. Regardless of George's statement, Tom believed the top hat plan was still in place as of 2010 because he concluded it was "replaced" by the 2010 agreement and the 2010 agreement "constituted a termination" of the top hat plan. (Doc. 59-2 at 99-100).

The parties do not recount any relevant events from 2010 until 2020. During that period both George and Tom continued to work for Temprite. While still working for Temprite, George died in 2020. After George's death, Temprite and Patricia renegotiated the terms under which Temprite would purchase Patricia's stock. Temprite and Patricia agreed to terms different than those required under the 2010 stock purchase agreement. Under the revised terms, Temprite agreed to pay Patricia a lump sum of one million dollars for her stock. (Doc. 59-2 at 101). That transaction was completed, and Patricia no longer owns any shares of Temprite stock.

At the time Temprite bought Patricia's shares, Patricia's granddaughter was staying with her. The exact circumstances are unknown but at some point, Patricia's granddaughter discovered a copy of the top hat plan in Patricia's home. Patricia then sent a written demand to Temprite for benefits under the top hat plan. The Court previously set forth in detail the sequence of communications after Patricia's initial demand for benefits. (Doc. 29 at 3-4). In brief, Patricia repeatedly demanded benefits while Temprite adopted the position the top hat plan did not exist.

In August 2022, Patricia filed this suit.[3] Temprite responded to the complaint by seeking dismissal based on Patricia's alleged failure to exhaust her administrative remedies. The Court rejected Temprite's argument because Temprite had not established or followed reasonable claims procedures. At the case management conference the Court discussed with the parties whether discovery was necessary. Temprite's counsel insisted discovery was needed because he expected to locate something "in writing confirming the termination of the top hat agreement." (Doc. 45 at 12). Based on that representation, the

---

[3] Patricia named as defendants the top hat plan, Temprite, and Brown. Benefits under the top hat plan are payable from Temprite's general assets. (Doc. 57-1 at 2). Therefore, the Court will group the defendants together for purposes of this Order and treat Temprite as the sole defendant.

- 5 -

Court authorized discovery. The parties conducted discovery, but defense counsel was unable to locate any clear written confirmation the top hat plan had been terminated. The parties then filed cross motions for summary judgment.

**ANALYSIS**

Temprite's arguments in connection with seeking and opposing summary judgment are difficult to follow. For example, Temprite argues Patricia is not entitled to benefits under the top hat plan because it would be "unfair" to consider the copy of the plan found by Patricia's granddaughter. Temprite concedes that copy is accurate and Temprite itself produced an identical copy of the top hat plan during this litigation. It is not clear why Temprite believes it would be "unfair" to consider an indisputably accurate copy of the most crucial document. Unfortunately, that is not the only confusing aspect of Temprite's filings.

Temprite's motion for summary judgment argues the top hat plan took effect in 2003 but it was later "amended or terminated, if not abandoned." (Doc. 58 at 2). In opposing Patricia's motion for summary judgment, Temprite adopts the contradictory position that the top hat plan "was not properly adopted by Temprite and is unenforceable." (Doc. 65 at 12). Temprite has not explained why its own motion for summary judgment is premised on the top hat plan taking effect in 2003 only for Temprite to later argue the top hat plan never went into effect.

Despite the lack of clarity regarding Temprite's positions, there is no dispute that, if the top hat plan is in place, Patricia is entitled to benefits under the plan. Accordingly, the relevant inquiries are whether the top hat plan was adopted and whether it remains in effect today. However, before reaching those inquiries the Court must first address a few evidentiary issues.

**I.      Consideration of the Top Hat Plan**

One of Temprite's main arguments is the Court should not consider the copy of the top hat plan found by Patricia's granddaughter. According to Temprite, the copy should not be considered based on "foundation, authentication, and hearsay; F.R.E. 1002, 1003."

(Doc. 66 at 2). Temprite concedes that accurate copies of documents "ordinarily are admissible." But here, Temprite claims "the suitable foundation for copy [sic] to be considered a business record lacks [sic] and it also is unfair to admit it under the circumstances." (Doc. 66 at 2). The meaning of this statement is not clear. To the extent Temprite is arguing the top hat plan is not a business record admissible under Federal Rule of Evidence 803(7), Temprite has not provided a coherent explanation why it would not qualify as a business record. But Temprite mentions the business record issue only in passing and instead seems to focus on its belief that it would be "unfair" to consider the copy.

The copy of the top hat plan that prompted this suit was found by Patricia's granddaughter and Patricia does not know exactly how that occurred. Temprite "does not contest [the copy] is an accurate duplicate" of the original, but Temprite argues Patricia's lack of knowledge regarding how it was found means she "cannot establish the context or circumstances in which this copy was found." (Doc. 66 at 3). Temprite speculates the copy may have been "located in a file or set of files with cancelled agreements or stored with other documents that indicate it was cancelled." (Doc. 66 at 3). Given that possibility, Temprite cites Federal Rule of Evidence 1003. That rule provides "[a] duplicate is admissible to the same extent as the original unless . . . circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003.

The "circumstances" that would make it unfair to consider the copy found by Patricia's granddaughter consist of Temprite's speculation the copy might have been found surrounded by documents showing the top hat plan had been canceled. Baseless speculation of this sort does not render "unfair" the admission of an indisputably accurate copy. If speculation were enough to require exclusion of duplicates, the exception in Rule 1003 would swallow the rule. That is, every party would be able to speculate about circumstances that, if true, would render admission of a copy "unfair." In this case, there is nothing "unfair" about considering the copy of the top hat plan found by Patricia's granddaughter. Moreover, Temprite does not explain why it is even presenting arguments

1  regarding the copy found by Patricia's granddaughter.

2  Temprite has not presented any argument why the Court cannot consider the copy of the top hat plan produced by Temprite during this litigation. The two copies are identical so nothing would be gained by considering one copy and ignoring the other. With no explanation why it matters which copy is considered, Temprite's arguments asking the Court not to consider the copy found by Patricia's granddaughter are close to frivolous. The Court will consider the undisputed terms of the top hat plan in resolving Patricia's motion.[4]

**II.    George's Testimony**

Crucial portions of Temprite's summary judgment papers rely on statements allegedly made by George. For example, Tom states that during the 2010 discussions "George said he had forgotten about the 2003 Top Hat Plan but thought we had a verbal understanding only, and agreed that the 2003 Top Hat Plan would go away and be replaced by" the 2010 agreement. (Doc. 59-2 at 98). Temprite relies on this statement as evidence showing George and Tom reached an agreement to rescind the top hat plan. Patricia argues this alleged statement by George, as well as others, are inadmissible hearsay because they are being offered for their truth. Temprite does not dispute the statements qualify as hearsay. Instead, Temprite argues the statements qualify as admissible because they fall under exceptions to the hearsay rule.

Temprite first argues George's statements are admissible because they were "statements against interest" under Federal Rule of Evidence 804(b)(3). Temprite does not meaningfully develop this argument. Instead, Temprite merely cites Rule 804(b)(3) and

---

[4] Temprite makes various arguments about its discovery efforts being stymied when it sent subpoenas to attorneys who worked for George and Patricia. Temprite hoped those subpoenas would produce written documents establishing the top hat plan had been canceled. Temprite's subpoenas to the attorneys called for the production of privileged material. The attorneys who received the subpoenas informed Temprite they could not produce the documents absent a waiver of the privilege. Apparently Temprite did not pursue the matter further. At the very least, it is undisputed Temprite did not seek a Court order requiring production of the materials. Discovery is closed and Temprite has not filed an affidavit pursuant to Federal Rule of Civil Procedure 56(d) stating additional time for discovery is needed. Based on these facts, Temprite cannot avoid summary judgment by arguing full responses to the subpoenas might have included helpful documents.

- 8 -

argues George's 2010 statements that the top hat plan would "go away" were against his interest because, under the top hat plan, George "had a contract right to be paid in retirement, and for his wife to paid upon his death." (Doc. 68 at 4). That is not enough to establish George's alleged statements are admissible under Rule 804(b)(3).

To be admissible under Rule 804(b)(3), a statement must have been one "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest." Fed. R. Evid. 804(b)(3). This requires the statement be "decidedly against the declarant's interest." *Donovan v. Crisostomo*, 689 F.2d 869, 877 (9th Cir. 1982). Statements cannot be admitted when the surrounding circumstances make it unclear if the statements were, in fact, contrary to the declarant's interest. This is illustrated by *Donovan v. Crisostomo*.

In *Donovan*, the Department of Labor had sued an employer for not paying overtime to numerous employees who were working in the United States under temporary visas. During pre-litigation interviews between government officials and the employees, some of the employees denied they ever worked overtime. The employer wished to introduce those statements during trial, but the district court determined the statements were inadmissible hearsay. The employer appealed, arguing the statements were admissible as statements against interest because they undercut the employees' entitlement to compensation for overtime worked.

The Ninth Circuit concluded the statements had been properly excluded. Considering the surrounding circumstances, it was not sufficiently clear the statements were against the employees' interest at the time they were made. In the Ninth Circuit's view, there was an obvious alternative explanation for the employees' statements: "A reasonable man in the position of [an employee], who could be sent back to [his home country] at his employer's discretion, might feel it was in his interest to state he was paid properly to avoid the wrath of his employer." *Id.* at 877. In other words, the employees might have concluded their interest in avoiding deportation was more important than their

interest in overtime compensation. That possibility meant the statements were not "decidedly against" the employees' interest and the statements had been properly excluded. *Id.*

Here, Temprite seems to be arguing George's statements regarding the replacement of the top hat plan were against his interest because George was entitled to payments under the plan. George's alleged statement that the top hat plan would be "replaced" would mean he was no longer entitled to the promised compensation. The larger context of George's statements, however, shows the statements might not have been "decidedly against" his interest. *Id.*

At the time George signed the top hat plan he was already past normal retirement age.[5] It is likely, or at the very least possible, George had no intention of retiring and no expectation he would ever receive compensation under the top hat plan. If George did not expect compensation, any statements indicating the top hat plan was going away were not against his interest. In other words, any statement by George foregoing compensation under the top hat plan were not, in George's view, giving anything of value up. Based on this, the Court cannot conclude George's statements were "decidedly against [his] interest." *Donovan v. Crisostomo*, 689 F.2d 869, 877 (9th Cir. 1982).

Temprite also argues George's statements are admissible because they reflect George's "state of mind" under Federal Rule of Evidence 803(3). (Doc. 68). Temprite does not develop this argument in a meaningful way and, because this argument is complicated, Temprite's failure is a waiver of that basis for admission. *See John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (noting failure to develop an argument is a waiver). In an abundance of caution, the Court will explain why this exception does not apply.

Temprite's appeal to the "state of mind" exception appears to be referencing what has become known as the "*Hillmon* doctrine." That doctrine is named after the Supreme Court's decision in *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285 (1892). Under this

---

[5] George was 97 when he died in 2020. (Doc. 59 at 5). As of 2003, George would have been 80.

- 10 -

doctrine, "when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown." *United States v. Pheaster*, 544 F.2d 353, 376 (9th Cir. 1976). Thus, "hearsay evidence of statements by the person which tend to show his intention is deemed admissible." *Id.*

In this case, George allegedly said to Tom that he agreed "the 2003 Top Hat Plan would go away and be replaced by" the 2010 agreement. (Doc. 59-2 at 98). Temprite seems to believe this statement could be used to show George intended for the 2010 agreement to "replace[]" the top hat plan. But that use would go far beyond a proper application of the *Hillmon* doctrine.

The *Hillmon* doctrine allows for evidence establishing an intent to perform a particular act. There is no indication the *Hillmon* doctrine can be applied to allow into evidence what a party believed a written agreement would accomplish. For example, if the dispute was whether George executed the 2010 agreement, perhaps his statements that he intended to execute the 2010 agreement would be admissible. But here, Temprite wishes to use the statements not to prove any act by George. Instead, Temprite believes George's statements are useful to prove the goal George was hoping to accomplish by executing the 2010 agreement. Temprite has not established the *Hillmon* doctrine can be stretched to allow the admission of out-of-court statements regarding George's subjective interpretation of the written 2010 agreement.

The proper application of the *Hillmon* doctrine has caused "controversy and confusion" over the years. *Pheaster*, 544 F.2d at 376. And even if Temprite had developed this argument, the present case would require extra caution because of the source of the out-of-court statements. In *Hillmon*, the out-of-court statements were being recounted by uninterested individuals. Similarly, in *Pheaster*, 544 F.2d at 376, the out-of-court statements were being recounted by non-parties. In this case, George's statements are being recounted by Tom, a party with a personal interest in the outcome of the case. Tom's potential bias raises significant cause for concern about the reliability of George's alleged statements. In these circumstances, it would be inappropriate to apply the *Hillmon* doctrine

to allow Tom's testimony regarding what George allegedly said. George's statements could not be presented in admissible form and cannot be considered at summary judgment.

### III. The Top Hat Plan is Enforceable

With the evidentiary issues resolved, Patricia's request for benefits requires resolution of two issues. First, whether the top hat plan went into effect. Second, if the top hat plan went into effect whether it was replaced by the 2010 agreement. The record viewed in the light most favorable to Temprite establishes the top hat plan was validly adopted and never replaced.

### A. Top Hat Plan Went Into Effect

Temprite argues the top hat plan is not enforceable because it was never "properly adopted by Temprite." (Doc. 65 at 12). Temprite's board allegedly "did not authorize an officer to sign or approve" the top hat plan. (Doc. 65 at 12). Absent authorization, the top hat plan "is not enforceable." (Doc. 65 at 12). In making this argument Temprite argues the resolution adopted by Temprite's directors on July 3, 2003, authorizing the execution of the top hat plan, was ineffective. That document stated it was executed on behalf of "all the Directors of Temprite" and was signed by George and Tom. The copy of the resolution in the record contains a handwritten "Bob" (*i.e.*, Bob Brown) below the signature lines, but does not include Brown's signature.

Temprite makes two arguments against the resolution being valid. First, Temprite argues the lack of Brown's signature is fatal because Brown was a director at that time. Second, Temprite argues George was a beneficiary of the top hat plan and his vote authorizing the plan was "illegitimate" because he had a personal interest at stake. (Doc. 68 at 2). Neither argument is correct.

Assuming Brown should have signed the resolution authorizing the top hat plan, there is no genuine dispute of material fact that Brown knew of and approved execution of the top hat plan. Three weeks after the top hat plan was executed, Brown sent a letter to the Department of Labor regarding the top hat plan. That letter stated Temprite "has an agreement" with George. (Doc. 57-1 at 8). It is undisputed the letter was referencing the

top hat plan. It is not possible Brown sent the letter without being aware of the top hat plan. Moreover, it is not possible to read Brown's letter and conclude Brown wished to repudiate the top hat plan. *See In re Canopy Fin., Inc.*, 2015 WL 3505010, at *3 (N.D. Ill. June 2, 2015) ("A party may be found to have ratified an unauthorized act by acquiescence if, after hearing of the act, it remains silent under circumstances that would give rise to a duty to repudiate the act."). To the extent necessary, Brown's actions were sufficient to ratify adoption of the top hat plan.

Regardless of Brown's actions, Temprite argues George was prohibited from voting on the resolution because it was authorizing a transaction that would benefit George. Even assuming George's participation was impermissible, Temprite has not cited authority that such participation rendered the resolution ineffective. That is, even assuming George should not have participated, the top hat plan was still approved by Tom and ratified by Brown. Because the resolution authorizing the top hat plan was adopted or ratified by the two non-interested directors, the top hat plan was effective as of July 2003.

**B. Top Hat Plan was Not Abandoned or Replaced by 2010 Agreement**

Temprite argues that if the top hat plan went into effect in 2003, it was later "abandoned" or "replaced." (Doc. 65 at 9). Regarding abandonment, Temprite seems to argue that, because George did not mention the top hat plan between 2003 and 2010, that "course of conduct" meant he "abandoned" the top hat plan. Temprite cites cases establishing the general proposition that parties to a contract may agree to abandon the contract. However, Temprite does not cite any authority that the absence of discussions indicates a contract was abandoned. A contract remains in place even when it is not a hot topic of conversation. There is no basis to conclude the top hat plan was "abandoned."

Temprite's argument that the top hat plan was "replaced" is based on the plan allegedly "merging" into the 2010 agreement. Temprite cites the integration clause in the 2010 agreement as establishing the parties intended to replace the top hat plan. The integration clause in the 2010 agreement states, in full,

> This Agreement contains the entire understanding of the parties in respect to the transactions contemplated hereby. All

> prior and contemporaneous negotiations, agreements, restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein, shall be deemed merged into tins [sic] Agreement. This Agreement supersedes all prior agreements and understandings among the parties with respect to the subject matter of this Agreement.

(Doc. 59-2 at 88). According to Temprite, the crucial language in this clause is "the subject matter of this Agreement." Temprite believes the subject matter of the 2010 agreement was "tak[ing] care of Patricia financially upon George's death." (Doc. 58 at 15). In Temprite's view, the top hat plan was also meant to "take care of Patricia financially upon George's death." Because of this allegedly shared subject matter, Temprite argues the integration clause in the 2010 agreement prevents enforcement of the top hat plan.

The parties agree the interpretation of the integration clause in the 2010 agreement should be governed by Arizona law.[6] Under Arizona law, "a completely integrated agreement supersedes only prior agreements that are within [the] scope of the new contract." *Dunn v. FastMed Urgent Care PC*, 424 P.3d 436, 440 (Ariz. Ct. App. 2018). To determine what is within the "scope of the new contract," a court should look to the language of both agreements as well as "surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like." *Id.*

Beginning with the language of the top hat plan, it does not state its intent was to "take care of Patricia financially upon George's death." Rather, the top hat plan states it was intended to retain George as an employee "and to compensate [George] for his service performed in the past." (Doc. 57-1 at 2). As for the language of the 2010 agreement, it also lacks any explicit statement that it was being executed to "take care of [Patricia] financially upon George's death." Instead, the 2010 agreement states it was "to promote [the stockholders'] best interests and for the best interests of [Temprite]." (Doc. 59-2 at

---

[6] The parties do not cite any authority establishing it is appropriate to look to state contract law to determine if an ERISA-governed plan was rescinded. Normally, courts look to federal common law when dealing with ERISA-governed plans. *See, e.g.*, *Dowdy v. Metro. Life Ins. Co.*, 890 F.3d 802, 808 (9th Cir. 2018) (noting federal common law applies when interpreting ERISA plan). However, because the parties agree Arizona law should apply to this unique situation, the Court will apply Arizona law.

81). The language of the two agreements does not establish they had a shared "subject matter." This fact weighs against concluding the integration clause in the 2010 agreement impacted the enforceability of the top hat plan.

Looking beyond the text to the "surrounding circumstances," the undisputed evidence establishes the 2010 agreement was not intended to impact the top hat plan. In fact, the top hat plan's existence was not even known to many of the crucial participants in the negotiation and drafting of the 2010 agreement. In his declaration, Tom states there was a meeting on May 17, 2010, between George, Tom, Temprite's counsel, and Temprite's accountant. (Doc. 59-2 at 97). There was no mention of the top hat plan during that meeting. After that meeting, the negotiations continued for two more months with no mention of the top hat plan. It was not until July 2010 that George and Tom discussed the top hat plan. And even then, neither George nor Tom disclosed the top hat plan's existence to the others involved in negotiating and drafting the 2010 agreement.

Temprite's counsel involved in drafting the 2010 agreement makes the unequivocal statement that "[a]t no time was the 2003 Top Hat Plan ever mentioned to me." (Doc. 59-3 at 12). Temprite's outside accountant, also involved in the negotiations leading to the 2010 agreement, provides similar testimony. The accountant states "[a]t no point" in 2010 was the top hat plan mentioned. (Doc. 59-2 at 173). In fact, the accountant was unaware the top hat plan existed until 2022. (Doc. 59-2 at 174). Given these surrounding circumstances, if the integration clause in the 2010 agreement reached the top hat plan, it would be a surprise to the professionals involved in the 2010 agreement's formation.

The only evidence the integration clause in the 2010 agreement was meant to reach the top hat plan comes from Tom. Tom states he "understood" the 2010 agreement was replacing the top hat plan. (Doc. 59-2 at 99). But it is undisputed Tom did not memorialize this understanding with anyone else involved in the 2010 transaction. Of particular importance, Patricia was a party to the 2010 agreement and there is no evidence anyone mentioned to her that the new agreement was intended to replace the top hat plan. Tom's subjective understanding and intent, not disclosed to others involved in drafting and

negotiating the contractual language, and also not disclosed to Patricia, is not enough to conclude the 2010 agreement impacted the top hat plan. The top hat plan was not replaced by the 2010 agreement.

### C. Top Hat Plan was Not Orally Rescinded

If the 2010 agreement did not replace the top hat plan, Temprite argues there was an oral agreement between Tom and George to rescind the agreement. While it may have been possible for the top hat plan to have been terminated through an oral agreement, there is no evidence of such an oral agreement here.

As mentioned earlier in footnote five, the enforceability of an ERISA-governed plan usually is approached under federal common law. *See Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1191 (9th Cir. 1998). And federal common law is formulated by considering the Restatement of Contracts, "state law and governing federal policies." *Id.*; *Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 932 (11th Cir. 2021) (relying on Restatement of Contracts in ERISA context). In discussing rescission of existing contracts, the Restatement provides in a comment "[e]ven a provision of [an] earlier contract to the effect that it can be rescinded only in writing does not impair the effectiveness of an oral agreement of rescission." Restatement (Second) of Contracts § 283 (1981). The parties have not cited, and the Court has not located, any authority discussing this rule in the context of a top hat plan. However, for present purposes the Court will assume it was possible the interested parties could orally agree to rescind the top hat plan.

Temprite has not pointed to any evidence it could introduce at trial that George and Temprite entered into an agreement to rescind the top hat plan. Tom seems to believe he and George might have entered into such an agreement. But even here, Tom seems to focus on the 2010 agreement replacing the top hat plan and not on an entirely separate oral agreement between George and Tom. Moreover, assuming Tom could testify to the existence of such an agreement, there is no admissible evidence George agreed to enter into such an oral agreement.

A more fundamental problem beyond the lack of admissible evidence from George is that Temprite has not explained how an agreement between George and Tom could have rescinded the top hat plan between George and Temprite. There is no evidence in the summary judgment record that Temprite itself entered into an oral agreement with George. In the context of claiming the top hat plan never went into effect, Temprite argued only the board of directors could authorize such an agreement. In context of rescinding the top hat plan, however, Temprite seems to argue Tom could take unilateral action. Temprite does not explain this inconsistency. Without evidence of an oral agreement between George and Temprite, the top hat plan remained in place.

### IV.   Conclusion and Judgment

The top hat plan was validly executed in 2003 and remains enforceable as of today. The parties will be required to confer and file a joint proposed judgment. That judgment should be accompanied by an explanation from the parties regarding how the monetary amount was calculated and which of the three defendants the judgment should be entered against. If either party believes the judgment should impose liability on any defendant other than Temprite, that party must set forth the legal basis for doing so. And if either party believes judgment need not be entered against particular parties, that party must set forth how the claims asserted against those parties should be resolved.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 56) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 58) is **DENIED**.

…

…

…

…

…

…

**IT IS FURTHER ORDERED** no later than **November 20, 2023**, the parties shall confer and file a statement and proposed form of judgment.

Dated this 9th day of November, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge